05-6440-cv
Coppola v. Bear Stearns

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: January 11, 2007   Decided: August 30, 2007)

Docket No. 05-6440-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VINCENT J. COPPOLA, MICHAEL BRESLIN, and OLIN MCDONALD, on behalf
of themselves and all others similarly situated,
   Plaintiffs-Appellants,

    v.

BEAR STEARNS & CO., INC., BEAR STEARNS HOME EQUITY TRUST, BEAR
STEARNS INTERNATIONAL LIMITED, and EMC MORTGAGE CORPORATION,
   Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:  WINTER, CABRANES, Circuit Judges, and KORMAN,
     District Judge.[*]

Appeal from a judgment of the United States District Court

for the Northern District of New York (Scullin, J.) granting

summary judgment to defendants-appellees on the ground that

defendant-appellee Bear Stearns was not an "employer" of

plaintiffs-appellants under the Worker Adjustment and Retraining

Notification Act, 29 U.S.C. §§ 2101-09.  We affirm.

---

[*]The Honorable Edward R. Korman, District Judge of the
United States District Court for the Eastern District of New
York, sitting by designation.

1

CORNELIUS D. MURRAY (Pamela A. Nichols, Michael D. Assaf, of counsel), O'Connell & Aronowitz, Albany, New York, for Plaintiffs-Appellants.

NEIL L. LEVINE (Alan J. Goldberg, John P. Calareso, Jr., of counsel), Whiteman Osterman & Hanna LLP, Albany, New York, for Defendants-Appellees.

WINTER, Circuit Judge:

The appellants here filed a class-action lawsuit against appellees Bear Stearns & Co., Inc. ("Bear Stearns" or "Bear"), Bear Stearns Home Equity Trust, Bear Stearns International Limited, and EMC Mortgage Corporation, for violation of the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101-09. Appellants claim that Bear Stearns closed the principal offices of National Finance Corporation ("NFC"), their employer and a debtor of Bear Stearns, and terminated their employment without the advance written notice required by WARN. Judge Scullin granted appellees' motion for summary judgment, holding that appellees had no liability under WARN because Bear was not appellants' "employer" within the meaning of the statute. We agree and affirm.

                    BACKGROUND

Given the procedural posture of this matter, we view the facts in the light most favorable to appellants. Cioffi v.

2

*Averill Park Cent. Sch. Dist. Bd. Of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). Appellants were employees of NFC until its closure on December 23, 1999. NFC's business consisted of the origination and resale of mortgages and home equity loans to residential customers. It earned revenue from fees charged for originating the loans and from premiums paid by purchasers of the loans in the secondary market. To conduct this business, NFC relied on two lines of credit: a short-term "operating" credit line from BankBoston ("BB"), and a longer-term "warehouse" credit line from Bear Stearns. NFC used the BB line to fund its origination of loans, which became collateral for the debt incurred to BB. If a loan on the BB line sold quickly in the secondary market, NFC would use the receipts to pay off its debt to BB. Otherwise, NFC would sell the loan to Bear and "sweep" it into the warehouse line, with the right and obligation to repurchase it from Bear in the event of resale or default on the part of NFC. When NFC sold a loan on the Bear warehouse line, it would pay Bear an agreed-on price to repurchase the loan from Bear and retain any profit earned from the sale. NFC paid off the amount owed on the BB line on an approximately weekly basis.

NFC fell on hard times in the fall of 1998, and by February 1999, could not fund its continued operations. To obtain the needed funds, NFC, chiefly through David Silipigno, NFC's then-President and CEO, retained money from sales of loans on the

3

warehouse line that it should have paid to Bear Stearns. NFC covered its tracks by falsifying the weekly loan schedules it submitted to Bear, listing resold loans as unsold and still available as collateral on the warehouse line.

In August 1999, NFC's misappropriations -- which by that point amounted to $5.6 million of Bear's money -- were discovered by Westwood Capital ("Westwood"), a company NFC had hired to help sell NFC. In November 1999, Westwood persuaded NFC to disclose its conduct to Bear. NFC's actions had placed NFC in default under the terms of the Master Repurchase Agreement ("MRA") governing its relationship with Bear, and Bear consequently had the right under the MRA to seize all loans on the warehouse credit line to pay off the line. Instead, Bear pursued a workout strategy that would allow NFC to remain in business for a time in the hope of selling NFC and using the proceeds to repay Bear.

Bear refused, however, to continue to do business with the individuals responsible for the fraud. In response, David Silipigno, Joseph Silipigno, and the other NFC personnel involved in the theft resigned as officers of NFC. Harvey Marcus, NFC's General Counsel, volunteered to serve as the new President and CEO. He was confirmed in this position by a "Unanimous Consent" executed on November 24, 1999, by NFC's board, which appears to have consisted solely of David and Joseph Silipigno. The Unanimous Consent also reflected that the Silipignos' resignation

4

as officers was effective as of November 23, 1999.

On November 23, 1999, NFC and Bear entered into a letter agreement (the "November 23 Agreement") formalizing the terms on which they would agree to continue their business relationship. Because Marcus had no experience managing a mortgage business, NFC hired an individual named Bill Bradley to run NFC until it was sold. Bear agreed to subordinate its claims against NFC to Bradley's bonus in the event of NFC's sale or bankruptcy.

Bear also accepted stock pledge agreements from the Silipignos representing their entire ownership interests in NFC (in total, 96% of NFC's stock). The pledge agreements reflect that Bear was entitled to exercise its rights at any time, upon notice of its intent to the pledgors, but Bear never voted or took any action with respect to the stock.

At this point, NFC needed new sources of funding. BankBoston had terminated NFC's operating credit line in response to NFC's fraud. Although the November 23 Agreement left NFC free to seek other sources of capital (both from financing for loan originations and from mortgage resales), NFC did not make much (if any) effort to do so, believing that such efforts would be futile given that word of NFC's fraud had spread through the industry. Bear itself was no longer willing to continue its warehouse line arrangement with NFC, but agreed that its subsidiary EMC Mortgage Corp. ("EMC") would make outright

purchases of certain types of loans originated by NFC. Bear hired the Clayton Group to evaluate the loans NFC proposed for purchase by EMC. The Clayton Group, serving as Bear's underwriter, performed these evaluations on-site at NFC after NFC's underwriters approved the loans in question.

While this arrangement enabled NFC to earn money from the purchase premiums paid by EMC and the origination fees paid by borrowers, NFC had no way as a practical matter to fund any loan that EMC was unwilling to purchase. Specifically, EMC purchased only loans falling within Bear's "B/C subprime" criteria, and NFC was therefore no longer able to originate and sell other types of loans that had previously been part of its product mix.

In early December 1999, NFC could not meet its payroll. Bear refused to loan any money to NFC for that purpose, but did agree to a "forward purchase transaction." Under that procedure, EMC advanced funds to NFC in the amount of payments EMC was about to make for loans that were "in the pipeline" but had not yet closed. NFC faced the same problem again with regard to its December 23, 1999 payroll and asked for another forward purchase transaction. This time, however, there were not enough loans "in the pipeline" to secure the amount necessary to cover the full payroll, and Bear refused to advance any amount that could not be secured. According to Bradley's deposition testimony, Bear stated that it would not fund payroll again, regardless of how

much could be secured, because Bear was to serve as a funding source for loans and not to cover payroll. Millie Freel-Mackin, then a Principal Banking Examiner II of the New York State Banking Department present at NFC pursuant to the Banking Department's investigation of NFC following disclosure of the fraud, attempted to obtain a loan to cover the payroll from a company that had been a potential buyer of NFC, but was unsuccessful.

Bradley and Freel-Mackin explained the situation to Marcus, and on December 22, 1999, they saw no alternative but to close NFC. However, the decision may have been made in substance at least a day earlier, as Paul Friedman, a Bear executive, sent an email on December 21, 1999, in which he stated that NFC would close its doors on December 22. In addition, Bear issued a notice of default to NFC, also dated December 21, stating that "You [NFC] have also advised us that you are ceasing operations." In any case, Marcus prepared a memo to NFC's employees announcing NFC's closure, which was posted on NFC's door on December 23, 1999.

Appellants filed suit on December 20, 2002, and a class was certified by stipulation and order on January 15, 2004. Bear moved for summary judgment on April 25, 2005, as did appellants on April 28, 2005. The district court entered judgment granting Bear's motion and denying appellants' motion on October 17, 2005.

Coppola v. Bear Stearns & Co., No. 1:02-cv-1581, 2005 WL 2648033 (N.D.N.Y. October 17, 2005). Appellants appealed.

DISCUSSION

We review a grant of summary judgment *de novo*. "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), see also Fed. R. Civ. P. 56. Material facts are those which "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We view the facts in the light most favorable to the non-moving party and resolve all factual ambiguities in its favor. Cioffi, 444 F.3d at 162.

Section 2102 of WARN requires employers to give 60 days' advance written notice before a plant closing or mass layoff. 29 U.S.C. § 2102. Section 2104 provides that "[a]ny employer who orders a plant closing or mass layoff in violation of [the notice requirements of] section 2102" is liable to affected employees for back pay and benefits. 29 U.S.C. § 2104(a)(1). "Employer" is defined as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week

8

(exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1).

The dispositive question on this appeal is whether Bear was an "employer" within the meaning of WARN. Three circuits have addressed the liability of a creditor under WARN for the plant closing or mass layoff of its borrower. The test employed by the Eighth and Ninth Circuits is whether, at the time of the plant closing, the creditor was in fact "responsible for operating the business as a going concern" rather than acting only to "protect [its] security interest" and "preserve the business asset for liquidation or sale." Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572, Int'l Bhd. of Teamsters, AFL-CIO v. Weslock Corp., 66 F.3d 241, 244 (9th Cir. 1995) ("Weslock"); Adams v. Erwin Weller Co., 87 F.3d 269, 272 (8th Cir. 1996) ("Adams") ("Only when a lender becomes so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business will the degree of control necessary to support employer responsibility under WARN be achieved.").

This test accords with traditional principles of lender liability. Under those principles, a creditor that has not assumed the formal indicia of ownership may become liable for the debts of its borrower if the lender's conduct is such as to cause it to become the debtor's agent, partner, or alter ego. See generally A. Gay Jenson Farms Co. v. Cargill, Inc., 309 N.W.2d

9

285 (Minn. 1981) (agency); <u>Martin v. Peyton</u>, 158 N.E. 77 (N.Y. 1927) (partnership), <u>Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.</u>, 483 F.2d 1098 (5th Cir. 1973) (alter ego).  On each of these theories, an essential part of the inquiry is whether the creditor has joined in or assumed control of the borrower's business as a going concern rather than as a means to protect its security for repayment.

For example, in <u>Cargill</u>, the court affirmed a jury verdict holding a lender, Cargill, liable for transactions entered into by its borrower, Warren.  309 N.W.2d at 290.  The court emphasized that "Cargill was an active participant in Warren's operations [for some ten years] rather than simply a financier," <u>id.</u> at 292, and that "the reason for Cargill's financing of Warren was not to make money as a lender but, rather, to establish a source of market grain for its [seed] business," <u>id.</u> at 293.  In <u>Martin</u>, the New York Court of Appeals affirmed judgment in favor of lender defendants and described the question as "whether in fact [the lender defendants] agree[d] to so associate themselves with the firm as to 'carry on as co-owners a business for profit.'"  158 N.E. at 79-80.  The court found that no partnership had been created, even though the lenders had imposed a complex of arrangements giving them substantial control over the firm and its principals.[1]

The Third Circuit has adopted a different test, believing

that a "more targeted inquiry" than that found in general lender liability cases "is appropriate" in the WARN context. Pearson v. Component Tech. Corp., 247 F.3d 471, 493 (3d Cir. 2001) ("Pearson"). Pearson adopted the factors identified by the Department of Labor ("DOL") as relevant to whether, for the purposes of WARN, "independent contractors and subsidiaries . . . are treated as separate employers or as a part of the parent or contracting company," 20 C.F.R. 639.3(a)(2), as "an appropriate method of determining lender liability as well as parent liability." 247 F.3d at 494-95. These factors are "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2). Pearson reasoned that "by directing courts to examine these particular factors, the Department of Labor was highlighting those aspects of corporate functioning that are most closely tied to the particular problems the WARN Act was intended to address." 247 F.3d at 493. In addition, Pearson specified that "if the evidence of the [defendant's] [de facto exercise of] control with respect to the [challenged] practice is particularly egregious . . . such evidence alone might be strong enough to warrant liability." Id. at 496.

Where lender liability under WARN is in issue, we believe that the appropriate test is the one used by Weslock and Adams

11

and in the traditional principles of lender liability for the debts of borrowers described above. With the exception of the "de facto exercise of control," the DOL factors -- commonality of ownership and directors/officers, unity of personnel policies, and dependency of operations –- are standard "piercing the veil" factors to be used in the case of related firms, MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001), and have little direct bearing on paradigmatic relationships between lenders and borrowers. Of course, the DOL factors may be relevant to the question of whether the entities' relationship is in fact that of parent and subsidiary rather than debtor and creditor, or perhaps some combination of the two. See Pearson, 247 F.3d at 493 (noting that "it will not always be clear when a party should be characterized as a 'lender,' when a party should be characterized as a parent or owner, and when a party occupies both roles"). Similarly, the presence of some or all of those factors in a putative debtor-creditor relationship may be evidence that a lender has so entwined itself in the management of the debtor's business as to incur liability for the debtor's actions.

In our view, however, the dispositive question is whether a creditor is exercising control over the debtor beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the de facto owner of an ongoing business. For

reasons stated below, a creditor may exercise very substantial control in an effort to stabilize a debtor and/or seek a buyer so as to recover some or all of its loan or security without incurring WARN liability.  When the exercise of control goes beyond that reasonably related to such a purpose and amounts to the operation of the debtor as an ongoing business -- such as when there is no specific debt-protection scenario in mind -- WARN liability may be incurred.

This test is consistent with both the text and policy of the statute.  "Employer" is not a word that commonly refers to creditors -- even large creditors -- and at best covers situations in which courts have found creditors to have undertaken acts that made them "owners."

Moreover, the policy of the statute would be turned on its head by a test that imposed WARN liability based on the exercise of control by creditors during a workout.  WARN is intended to cushion the blow to workers of mass layoffs or plant closures by requiring 60 days' notice by the employer.  If creditors cannot undertake a short-term workout that, as in the present circumstances, requires an exercise of control without risking WARN liability, there will be fewer workouts and more business closures, many without WARN notice.  Such control is essential to inducing creditors to forbear and to attempt a workout.  However, the leverage that creditors have over businesses that can't pay

their debts exists because everyone in such a business -- particularly its employees -- is better off with creditor forbearance and support, even with stringent conditions, than with the creditors deciding not "to throw good money after bad." For example, on the present record, there is every reason to believe that the prospect of WARN liability would have caused Bear to walk away in November 1999.

In fact, Congress foresaw that WARN liability and the needs of a capital-starved business might be inconsistent and provided a defense for employers where giving timely notice would have impaired an employer's active efforts to obtain capital that would eliminate the need for a shutdown. 29 U.S.C. § 2102(b)(1). In our view, Congress could hardly have also intended an expanded definition of employer that would impose WARN liability on lenders who seek appropriate protective controls on borrower behavior.

In the present case, the parties vigorously dispute the events of November-December 1999. In appellants' view, Bear took over NFC and ran it: Bear fired NFC's officers, chose a replacement, and regulated the loans NFC could make, effectively controlling everything. In Bear's view, it acted as a concerned creditor, making suggestions here and there, and protecting itself and NFC from the underwriting of improvident loans. If de facto control were the question, it would, as appellants argue,

probably be a jury issue. But, even under appellants' view, WARN liability does not attach.

Appellants rely on a November 18, 1999 letter from NFC's general counsel, Harvey Marcus, to Phil Cedar, one of Bear's in-house lawyers, purportedly memorializing Bear's actions as of that date, and (to some extent) Marcus's deposition testimony. Appellants also make much of a November 16, 1999 memo (the "Friedman Memo") from Paul Friedman, a Bear executive, to Bear's executive committee.

The Marcus letter, the veracity and even mailing of which is disputed by Bear, states, inter alia, that Bear "took unilateral control over and responsibility for the continued operations [of NFC]," "unilaterally terminated the employment by NFC of [certain] employees," "sent a team of its own" to underwrite and purchase loans originated by NFC, and "install[ed] a caretaker/manager at NFC's Headquarters." It also states, however, that Bear's purpose was "to facilitate [Bear's] recovery of $5.6 million unsecured and overdrawn on the Master Repurchase Agreement."

The Friedman Memo outlines Bear's possible response to the NFC crisis and suggests some steps that would exert control, i.e., firing NFC's principals and installing an underwriter to originate and purchase loans. However, the Friedman Memo's plan was intended to "allow the company to operate" for the "3-4 weeks

15

. . . it would take a prospective buyer to evaluate whether to buy the company."

Therefore, the evidence shows no more than that Bear exerted the control necessary for it to attempt a workout possibly resulting in the salvage of NFC. "[S]uch a power is inherent in any creditor-debtor relationship and . . . the existence and exercise of such a power, alone, does not constitute control for the purposes of "WARN, just as it does not constitute control in the ordinary alter ego context." Krivo, 483 F.2d at 1114 (internal quotation marks omitted). Viewing the facts in the light most favorable to appellants, the control exerted by Bear was indeed substantial but no more than was needed for a lender who had been defrauded of $5.6 million by NFC's management and who was attempting to salvage a company bereft of cash.

We note that the facts here bear little similarity to cases in which lender liability has been found, such as Cargill. Like the present case, the lender there purchased all or nearly all of the debtor's output and the debtor's operations were financially dependent on the lender's infusions of capital. 309 N.W.2d at 292. However, unlike the present case, the lender in Cargill did so for ten years in order to get a steady supply of grain, id. at 288-89, while Bear took no long-term interest in the operation of NFC as a business. Rather, the record shows that Bear's conduct was prompted solely by a short-term interest in facilitating the

sale of NFC as a means of salvaging some of the debt it had extended. This is not sufficient to trigger WARN liability.

CONCLUSION

Accordingly, we affirm.

FOOTNOTES

1.  We briefly summarize the loan agreement at issue in Martin. In 1921, faced with mounting financial difficulties, the brokerage firm of Knauth, Nachod & Kuhne ("KN&K") obtained a loan from the defendants consisting of $2,500,000 worth of liquid securities.  158 N.E. at 78-79.  The terms of the agreement provided the defendants with, inter alia, (1) a number of KN&K's own securities that were too speculative to "be used as collateral for bank loans," (2) 40 percent of the firm's profits until the return was made, and (3) an option to join the firm if they expressed a desire to do so by a certain date.  Id. at 79. Because the safety of the loan depended on KN&K's success, the terms of the deal granted the lenders substantial control over the firm's business activities.  Id. at 79-80.  For example, two of the defendants were to act as "trustees," supervising all transactions that affected the loaned securities.  Id. at 79. Likewise, the trustees were to be consulted about other important business matters, were entitled to any firm-related information they sought, and were permitted to veto any transaction they deemed too "speculative or injurious."  Id.  Further, each member of KN&K was "to assign to the trustees their interest in the firm," and agree to resign if the trustees thought "that such resignation should be accepted."  Id. at 80.  As additional

18

security, the directing management of the firm was to be placed in the hands of one particular KN&K partner -- a man whom the defendants knew and trusted.  Id.  Despite these control provisions, as well as several others, the court held that the loan agreement was simply not enough to create a partnership. Id.