**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, and its Local 155, Plaintiffs,**

v.

**MRC INDUSTRIAL GROUP, INC., La-Salle Bank Midwest, N.A., General Motors Corp., Lear Corp., Fisher & Co., Inc., and Alliant Lake City Small Caliber Ammunition Co., Defendants.**

No. 06–12880.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 11, 2008.

William J. Karges, III, International Union, UAW, Detroit, MI, for International Union and its Local 155.

Lawrence J. Murphy, Detroit, MI, for General Motors, Lear Corporation, Fisher & Co.

Robert T. Kugler, Leonard, Street and Deinard, Minneapolis, MN, for Alliant Lake City Small Caliber Ammunition Co.

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARIANNE O. BATTANI, District Judge.

Plaintiffs, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and Its Local 155, filed this action after MRC Industrial Group Inc. ("MRC"), a former employer of union members, closed without giving notice as required by the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 *et seq.* Before the Court is Defendants General Motors (GM), Lear Corp. (Lear), Fisher & Co., Inc. (Fisher), and Alliant Lake City Small Caliber Ammunition Company's (Alliant) Motion for Summary Judgment. For the reasons stated below, Defendants' motion is **DENIED**.

### I. STATEMENT OF FACTS

Plaintiffs filed this lawsuit against their members' former employer, MRC, its secured lender, LaSalle Bank, and several of its customers, including movants (hereinafter "Customer Defendants"). On November 4, 2005, MRC's creditors filed an invol-

untary petition under Chapter 11 of the Bankruptcy Code. On November 15, 2005, Customer Defendants agreed to provide financial accommodations during the company's bankruptcy. Specifically, after Customer Defendants learned that MRC would be forced to cease production of component parts unless it obtained funding, they entered into an Accommodation Agreement, Access and Security Agreement, and Subordinated Participation Agreement, approved by the bankruptcy court. Section 4.04 of the Accommodation Agreement allowed Customer Defendants "full, complete and reasonable access to [MRC's] operations, books and records at any time during regular business hours, or outside of regular business hours upon reasonable request and prior notice, for the purpose of meeting with [MRC's] representative and monitoring compliance with the Agreement...." Customer Defs.' Ex. C.

Customer Defendants hired BBK, a consulting firm, to monitor compliance at MRC's Warren facility. BBK personnel assigned to the job had extensive managerial experience. *See* Pls.' Ex. 14. Customer Defendants made provision allowing them to continue operations at the facility indefinitely until they completed their production requirements. Pls.' Exs. 15 (BBK memo discussing option to extend production for as much as two weeks if necessary to complete work in progress), 17 (Customer Defendants requested extension of financing through the end of February), and 18, pp. 9, 21–22, 25 (Tr. Feb. 6, 2006, hearing regarding the auction sale).

MRC closed its business and terminated employees on February 18, 2006. Plaintiffs assert that Customer Defendants failed to give notice of a plant closing to Plaintiffs.

## II. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. Proc. 56(c), a motion for summary judgment is to be granted only if the evidence indicates that no genuine issue of material fact exists. To avoid summary judgment, the opposing party must have set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986).

The sufficiency of the evidence is to be tested against the substantive standard of proof that would control at trial. *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. The moving party has the burden of showing that there is an absence of evidence to support the non-moving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. In disposing of a motion for summary judgment, this Court must consider the evidence in the light most favorable to the nonmoving party, but may weigh competing inferences for their persuasiveness. *Matsushita*, 475 U.S. at 574, 106 S.Ct. 1348.

## III. ANALYSIS

Customer Defendants advance several grounds for awarding them summary judgment. They maintain that they are not employers for purposes of WARN, that even if they are deemed employers two exceptions are applicable: the unforeseeable business circumstances exception and the good faith exception. They also ask

the Court to award them reasonable attorney fees under the statute. The Court addresses the merits of their arguments below.

## A. EXERCISE OF CONTROL

■ The parties dispute whether the Customer Defendants exerted sufficient control over the business to become "employers" for purposes of WARN Act liability. Under WARN, covered employers are required to give written notice of an impending plant closing or mass layoff no less than 60 days before the action is taken. 29 U.S.C. § 2102(a).

The purpose of the Act is to extend protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a).

A review of the statute, its applicable regulations, and its legislative history indicate that "employer", as defined in 29 U.S.C. § 2101(a)(1) includes: "any business enterprise that employs—100 or more employees, excluding part-time employees; or 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)". Customer Defendants did not employ MRC's workforce. Nevertheless, a creditor can become liable for providing notice under WARN, when it becomes "so entangled with its borrower that it has assumed responsibility for the overall management of the borrower's business." *Adams v. Erwin Weller Co.*, 87 F.3d 269, 272 (8th Cir.1996). In *Adams*, a lender received

permission to monitor the creditor's assets, inventory, and expenditures. *Id.* at 272. The creditor also replaced its management with a consultant suggested by the lender. In finding that the lender was not transformed into an employer, the court noted,

The mere fact the loan documents give some control over the borrower to protect the lender's security interest does not automatically make the lender a WARN employer. A lender can legitimately restrict its borrower's financial and business activities, monitor the borrower's business doings, and participate in the borrower's management, to protect the lender's investment and the collateral securing its loan.

*Id.* at 271. The Ninth Circuit affirmed an award of summary judgment to a lender in *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 (AFL–CIO) v. Weslock Corp.*, 66 F.3d 241 (9th Cir.1995). The court found the defendant's failure to participate in production decisions, marketing, and employment practices undermined any claim of de facto control. In *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 497 (3d Cir.2001), the appellate court focused on Department of Labor factors in deciding whether a subsidiary was a separate employer or part of the parent company, but noted that a "functional assessment of the amount of control exercised by the lender," standing alone, might be enough. Finally, the Second Circuit Court of Appeals, articulated the inquiry as "whether a creditor is exercising control over the debtor beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the *de facto* owner of an ongoing business." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 150 (2d Cir. 2007). It acknowledged that a creditor was free to exert "substantial control in an effort to stabilize a debtor and/or seek a buyer so as to recover some or all of its loan or security without incurring WARN

liability." *Id.* The line is crossed when control "amounts to the operation of the debtor as an ongoing business-such as when there is no specific debt-protection scenario in mind. . . ."

Accordingly, the Court directs its attention to the record in this case to determine whether the amount of control Customer Defendants exercised is insufficient as a matter of law to incur liability. The Accommodation Agreement granted Customer Defendants monitoring rights over MRC's operations, and Customer Defendants posit that is all they did. They operated under an agreement approved by the Bankruptcy Court. Moreover, MRC's former CEO, Steve Engelman, who acknowledged that BBK controlled the purse strings, testified that MRC management continued to run the company. Pls.' Ex. 12, Engelman Dep., p. 92. He apparently locked out BBK personnel in early December when he disputed whether five to six representatives in the plant every day constituted "reasonable access." Pls.' Ex. 16; Defs.' Ex. G (memo articulating BBK's defined scope of work). BBK personnel testified that they only "monitored" production at the Warren facility; that BBK's role was merely to "understand" what was happening at the Warren facility, and the only action expected of BBK was to "report" that understanding to Customer Defendants. Pls.' Ex 2, Smith Dep., pp. 18–19; Pls.' Ex. 7, Mahon Dep., pp. 8–9, 44; Pls.' Ex 10, Fischer Dep., pp. 32, 61–62, 68, 95; Pls.' Ex. 11, Kelly Dep., pp. 21–22.

Contrary to Customer Defendants' characterization, Plaintiffs assert that the facts in this case provide ample grounds for finding a question of fact as to whether Customer Defendants exerted sufficient control over MRC to incur WARN liability. This Court agrees. There is evidence, viewed in the light most favorable to Plaintiffs, that the Customer Defendants, through BBK, controlled operations at the plant. Customer Defendants dictated who the company could keep as customers, created production schedules, supervised production, and authorized overtime on holidays. Pls.' Ex. 20, p. 000366 (Customers·Defendants imposed conditions regarding other customers); Pls.' Ex. 13, Schulenburg ·Aff., ¶¶ 5–7 (BBK personnel dictated production schedule; BBK was in charge of the plant); Pls.' Ex. 21 ("BBK developed a production schedule that encompassed both bank build and normal requirements" and "BBK provided manufacturing floor oversight, attended production meetings and reviewed schedules and output with company."); Pls.' Ex. 22 ("BBK addressing obstacles with production, outside suppliers and labor."); Pls.' Ex. 2, Smith Dep., pp. 57–58 (Customer Defendants decided to run on the holiday).

Further, a BBK report identifies not only financial but, also, operational services BBK provided to address potential roadblocks. Pls.' Ex. 24. The report, issued after the lockout by Engelman, when viewed in conjunction with the testimony of the Union Representative, Daniel Donneilon (Pls.' Ex. 9), and the Chief Operating Officer, Steven Schulenburg[1] (Pls.' Ex. 13), provide a sufficient basis to deny this motion. Some highlights of the report, which enumerates twelve financial and operational issues and describes the "BBK Action & Benefit" related thereto, follow. BBK identified as an issue, "Raw Material Management System found to be Grossly Inadequate." BBK's action in response included: ·

---

**1.** Although Customer Defendants maintain that the Court should discount Schulenberg's testimony as lacking foundation and contrary

to Engelman's, Engelman admitted that Schulenberg ran operations.

BBK identified all raw materials necessary to complete customer requirements and demanded MRC order and receive material as soon as possible. BBK had to continually address the wire issue with MRC material personnel and management to attempt to get raw material in house. BBK then went directly to the wire suppliers to assure wire was ordered and reviewed delivery lead times.... MRC would not have been successful or able to bring wire in house without BBK's intervention.

*See* Pls.' Ex. 24, p. 3. Another issue BBK identified was "Weak Production Management of the Shop Floor." BBK's action in response included participation in production meetings:

When the company continued to be unresponsive in addressing production issues BBK assigned operational personnel to be on the shop floor to monitor machine output and push MRC supervisors to address schedule compliance and lack of productivity.

*See* Pls.' Ex. 24, p. 4. When BBK identified a "Failure of Company to Include Customer Bank Requirements on Ship Schedule," it "developed a production schedule that included customer and bank requirements together." Pls.' Ex. 24, p. 4. In addition, BBK "produced an independent rough capacity analysis by machine type' to show management that all orders could be produced on existing equipment in specified time frames." *Id.* "BBK's operation personnel were able to sue this tool with MRC supervision to improve drastically machine utilization." *Id.*

When MRC failed to identify "Tooling Requirements of Scheduled Production," BBK "forced the company to conduct an inventory of perishable tooling against the production schedule and provide BBK with a list of all tools required to complete the builds...." According to BBK, it "had to find machine shops, and tool suppliers that could meet tight timing to keep machines running. MRC would have let machines sit idle or would have run non-participating customer product had BBK not intervened." Pls.' Ex. 24, p. 5. Finally, BBK identified a conflict between MRC and the Customer Defendants in that MRC placed a low priority on most of their products. BBK

uncovered many instances where MRC management instructed schedulers and supervisors to change a machine over from running participating customer product to non-participating. BBK was able to get MRC to change these machines back faster than originally scheduled by insisting MRC only run critical orders. Customers' product was given higher priority since BBK was on site.

*Id.*

In addition, BBK's invoices to the Customer Defendants reflect that its conduct on behalf of Customer Defendants, viewed in the light most favorable to Plaintiffs, exceeded "monitoring," "understanding" and "reporting." BBK's fee summary likewise reveals that BBK can be viewed as running the operation. *See* Pls.' Ex. 25. BBK billed for the following services:

Work with MRC and BBK team on expediting parts through system, internal and external.

Review inventory status, all stages, to gain information regarding part bank status.

Coordinate BBK operations team meeting discussing poor weekend performance, possible solutions, etc.

Assist MRC staff with critical customer shipments through the evening. Meet with supervisor to discuss overtime for participating customers.

Negotiated structure on over line with LaSalle Bank ... Meetings with BBK team on updates and strategy to address liquidity crisis. Reviewed and discussed

revisions to DIP budget, workers comp insurance premium and other production matters with BBK team.

Review of strategy and financials ... Discussion with M. Pizzomo on union cancellation cost, other budget risks, holiday work schedule. Participate in BBK customer material schedules for critical jobs. Finalize details for suppliers to work during the Holiday week. Verified packaging department understands quantity requirements and are working to clean up backlog.

Monitored shop floor on an hourly basis to make sure production of Customer Group product is flowing.

At MRC to assure production of Customer Group product. Held production meeting with company to review planned production through 2/11.

Meet with company managers and BBK staff to review throughput improvements, outside supplier cooperation and payments, etc.

Worked with Company to determine Header schedules. Prepare weekend overtime schedule and forward to M. Pizzorno for funding call.

Talk to several MRC production staff to generate good will. Meet with several MRC employees to discuss overall comfort with employment and customer production goals (build good will as much as possible).

Received update on the proposed sale of business strategy and requested that we be keep informed as they need our approval. General conversations with MRC workers in an effort to gain support towards customer goals. Meet with several MRC employees to discuss all topics ranging from customer part production to pension concerns to potential new owner issues. Redirected third shift activities to pack operation.

Push company to man critical areas for customer group.

Concentrate effort in final pack area, pushing company to move manning resources around to cover shortfalls.

Assist with resolution of salary vacation and weekend staffing. Discussed extension of time for Customers. Talked with D. Bartlett regarding LaSalle debt, and BB for paying expenses this week.

Pls.' Ex. 26.

In addition, BBK dealt directly with the Union regarding terms and conditions of employment at the Warren facility. BBK negotiated with the Union regarding accrued vacation pay. Pls.' Ex. 13, Schulenburg Aff., ¶ 8. General Motors' bankruptcy lawyer, drafted the vacation agreements. Pls.' Ex. 27. *See* Pls.' Exs. 28–30, signed vacation agreements. BBK dealt directly with the Union when employees threatened to walk out because the health insurance premiums had not been paid. Steve Schulenburg, Executive Vice President and COO of MRC, told Union Representative Donnellon that BBK was in charge of the plant. Pls.' Ex. 9, Donnellon Dep., pp. 56–58; Pls.' Ex. 13, Schulenburg Aff., ¶ 7. Donnellon negotiated with BBK regarding a variety of issues affecting wages, benefits and working conditions, *Id.*, Pls.' Ex. 9, Donnellon Dep., pp. 45–47, 57–58, 62–75, 81–87, 95–97, 100–101

The following BBK invoices, attached as Ex. 26, show that Customer Defendants were very much involved in labor relations issues at the Warren facility:

File review, prepared liquidation analysis, reviewed payment request and union strategy issues with Petoskey plant closure.

Advise of potential union issue and set strategy.

Addressed and monitored union meeting and work interruption between 1:30–4:30.

Participated in two conference calls to update customers on union status.

Assist in Union Employee concern resolution activities.

Dealt with Union vacation issues.

Review and participation in several conference calls to determine strategy with MRC hourly workers accrued vacation pay. Met with MRC and union committee to get resolution and continue to meet production needs through 2/11.

On site at MRC to coordinate issues related to possible union work stoppage. Attend various conference calls with union to negotiate payment of union vacation.

Addressed and structured Accrued Vacation letter for the union.

Review draft letter to UAW local to confirm agreement [regarding] language for agreement of pay for vacation.

Review vacation pay letters with Union representatives

Meet with Union representatives to obtain additional cooperation.

Attend meeting with UAW local regarding signature of letter guaranteeing Sunday payments for work post wind down. Contact staffing firms related to support for Thursday production in event that labor walks out.

In *Smith v. Ajax Magnathermic Corp.*, 144 Fed.Appx. 482 (6th Cir.2005) (unpublished decision attached as Pls.' Ex. 38), the Sixth Circuit recognized that a secured lender takes on WARN Act liability when it operates the business as a "business enterprise" in the "normal commercial sense." (citing *Chauffeurs, Sales Drivers, Warehousemen & Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir.1995)). Plaintiffs have presented sufficient evidence suggesting that Customer Defendants, through BBK, were operating the Warren plant as a business enterprise to meet their burden in opposing this summary judgment motion. The facts suggest that Customer Defendants' actions exceeded conduct to protect an investment, their conduct is more akin to that of an employer running its assembly lines, and viewed in the light most favorable to Plaintiffs, BBK kept the Warren facility operating as a going concern, determined how long they needed the Warren facility to operate to fulfill their product needs, prepared a budget to cover that time period, and sought permission to operate the plant after it closed until they no longer needed production.

Customer Defendants urge the Court to find that this conduct is protected by virtue of the bankruptcy proceedings. The bankruptcy court had approved their agreements with MRC. They assert that if the Court concludes otherwise, it will create "a policy adverse not only to creditors, but to troubled companies (and their employees) and to the bankruptcy process itself. Customer Defendants' participation gave MRC's employees the opportunity to earn additional wages, to collect vacation pay, and the possibility for continued employment in the event the going concern sale could have been consummated." Customer Defendants' Reply, p. 5. They cite no case supporting their proposition that bankruptcy court involvement absolves WARN Act liability. Unlike the typical circumstances in which lender liability is raised, at the time the bankruptcy petition was filed, Customer Defendants were not lenders. Thereafter, they assisted in the creation of the budget used to operate the plant, and asserted a right to operate the plant after funding ceased, if necessary to complete production of their purchase orders. The Court cannot condone a blanket absolution given the fact driven analysis undertaken by all the circuit courts to address employer liability. Here, there is sufficient evidence suggestion that Customer Defendants exceeded the monitoring boundaries established in

the Accommodation Agreement. Accordingly, summary judgment on this ground must be denied.

## B. UNFORESEEABLE BUSINESS CIRCUMSTANCE

■ Even if Customer Defendants are deemed employers, they contend that the unforeseeable business circumstance exception applies and waives the sixty-day notice requirement that an employer must give because business circumstances that were not "reasonably foreseeable" caused the closing. 29 U.S.C. § 2102(a). The Court disagrees.

WARN's sixty-day notice period is reduced or eliminated, provided the closing is "caused by business circumstances that are not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The Department of Labor has promulgated regulations interpreting the "not reasonably foreseeable" language. "The commentary refuses to classify certain types of circumstances as per se unforeseeable and suggests that courts examine each case on its own merits to determine whether the employer in the exercise of 'commercially reasonable business judgment' could have foreseen the particular circumstances that caused the closing." *Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 180 (3d Cir.1999); *see also Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1060 (8th Cir.1996) ("In formulating regulations interpreting [the unforeseeable business circumstances] exemption, the [DOL] was reluctant to list examples of events that would, without deviation, qualify as unforeseeable business circumstances. Rather, the DOL indicated that the propriety of utilizing the exception in any particular scenario involves a highly factual inquiry to be assessed on a case by case basis.") (citations omitted).

The regulations, however, do suggest that circumstances that are "sudden, dramatic, ... unexpected ... [and] outside of the employer's control" generally fall within this exception. 20 C.F.R. § 639.9(b)(1). Among the circumstances that may be unforeseeable are,

> A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn....A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

*Id.* The DOL focuses on an employer's business judgment. "The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services." 20 C.F.R. § 639.9(b); *Watson v. Michigan Indus. Holdings, Inc.*, 311 F.3d 760, 763–64 (6th Cir.2002) (affirming lower court's holding that exception relieved an employer of liability because the closing was caused by a customer's decision to stop paying and termination of its relationship with the employer).

Customer Defendants claim that the plant closing was caused by business circumstances that were not reasonably foreseeable. According to Customer Defendants, MW Universal ("MW") intended to continue operations at the Warren facility and it was not reasonably foreseeable that the sale to MW would fall through. In fact, all parties were surprised when MW "abruptly announced at the auction that it would not have sufficient financing to purchase the business as a going concern,"

The characterization is undermined by the record. MRC entered bankruptcy purportedly hoping to reorganize and stay in business. At the same time, Steve Engelman, its President and CEO, focused on selling the assets. Engelman Dep. 36–37. MRC, the bank and the Customer Defendants chose MW Universal (hereinafter "MW") as the "stalking horse" bidder. Pls.' Ex. 32, pp. 43–44.

> The purpose of a stalking horse bid is to set the floor for the auction sale of a debtor's assets. To compensate the stalking horse for the "cost" of showing its hand before the auction, conducting due diligence and otherwise facilitating the creation of a market, bankruptcy courts frequently authorize payment of a break-up fee to the stalking horse should its bid not be the successful bid.

Calvin Ball Cannot be Played on this Court: The Sanctity of Auction, 11 Journal of Bankruptcy Law and Practice 189 (2002).

The evidence shows that Engelman and some of the Customer Defendants thought or hoped the MW deal would be sealed. Nevertheless, at the same time, plans were being made for a winding down of the operation. *See* Pl's Ex. 33, November 28, 2005 letter from Engelman to Ford Motor Co. ("As of this date, MRC is seeking a buyer for the business and is simultaneously planning an orderly wind down of operations."), and December 1, 2005, letter ("As of this date, MRC is working with various potential purchasers of the entire business or certain assets or business units of the Company. Concurrent with these activities, MRC is preparing a plan to orderly wind down the operations of the Company by the middle of February."); *Accord* Pls.' Ex. 34, ¶ 8, December 16, 2005, memo to employees ("there are several parties expressing a serious interest in the Company ... at this point, we cannot be sure of the final outcome of this process ...").

Of the forty interested buyers only MW intended to operate the business as a going concern. Pls.' Ex. 32, p. 8, 11–12, 16–17; Defs.' Ex. P, p. 12. MW was having trouble financing the deal. Pls.' Ex. 18, p. 25. Even Engelman recognized that the deal with MW was "riskier" than other deals. Pls.' Ex. 35 ("... but I think George is riskier" referring to MW's owner George Hofmeister.); Pls.' Ex. 36 (deal with George "... is not sitting well with [Engelman]."). MRC, the bank, and the Customer Defendants were having trouble negotiating an asset purchase agreement with MW. Pls.' Ex. 32, p. 43–44. MW would only agree to an unusually low deposit. During a hearing on the sale procedure, the Bankruptcy Judge inferred that there was a "reasonable likelihood" that a buyer other than MW would purchase the company. Pls.' Ex. 32, Tr. January 30, 3006, bankruptcy hearing, p. 53–54.

This evidence demonstrates that the pitfalls associated with a sale to MW were neither hidden nor imagined. *See e.g.* Pls.' Ex. 18, p. 25; Pls.' Ex. 32, p. 8. The fact that the sale did not come to fruition cannot be characterized, as a matter of law, as unforseen, unexpected, or sudden. In addition, to take advantage of the unforeseeable business circumstance exception the employer must give "as much notice as is practicable." 20 C.F.R. § 639.9(b). Customer Defendants did not do so even after the sale to MW fell through, and the Company was sold to a buyer who intended to liquidate the assets. Accordingly, summary judgment on this issue is denied.

### C. GOOD FAITH EXCEPTION

The parties also contest whether the good faith exception applies here. Under WARN, an employer that provides "to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had rea-

sonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section." 29 U.S.C. § 2104(a)(4).

Customer Defendants assert that every effort was made to keep the parties informed of the sale process, and that no employee suffered an actual injury. Their reliance on *Kildea v. Electro Wire Prods.*, 60 F.Supp.2d 710 (E.D.Mich.1999), in support of their argument that they acted in good faith is misplaced. In *Kildea*, the company/employer consulted with an attorney and then gave proper written notice to active employees, seven employees on a leave of absence, the city, and the Governor's office, but not to some employees that had been laid off. Although the laid off employees were entitled to notice under the statute, the district court did not impose liability because it found the company acted in good faith.

In contrast, here Customer Defendants present no evidence that they consulted an attorney about WARN Act obligations, gave notice to any employees, or even considered whether they had an obligation to give notice. Their contention that "every effort was made to keep the parties informed of the sales process" does not demonstrate good faith as a matter of law. The facts show that MRC and the Customer Defendants believed that giving WARN Act notice would cause employees to leave and/or be unruly. Customer Defendants had a financial interest in keeping employees working at the Warren facility until the plant closed and were worried about attrition. *See* Pls.' Ex. 2, Smith Dep., pp. 72–73; Pls.' Ex. 5, Nelson Dep., pp. 29–30; Pls.' Ex. 26, Fischer Dep., pp. 86–87, 100–101. Engelman testified that giving a WARN Act notice would have been harmful to the efforts to sell the business be-

cause employees would want to leave. Pls.' Ex. 12, Engelman Dep., p. 16.

That, however, is the purpose of the WARN Act—to give employees a chance to leave on their own terms. The Court therefore denies Customer Defendants' motion on this claim.

### D. ATTORNEY FEES

WARN provides that the court, "in its discretion, may allow the prevailing party reasonable attorney fees as part of the costs." 29 U.S.C. § 2104(a)(6). Because the Customer Defendants have not prevailed in their request for summary judgment, the Court finds their request for reasonable attorney's fees is moot.

## IV. CONCLUSION

For the reasons stated above, Customer Defendants' Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**