*Agerbrink v. Model Service LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 24ᵗʰ day of September, two thousand nineteen.

PRESENT:
ROBERT A. KATZMANN,
*Chief Judge*,
RICHARD C. WESLEY,
JOSEPH F. BIANCO,
*Circuit Judges*.

---

EVA AGERBRINK,

*Plaintiff-Counter-Defendant-Appellant*,

v.                                                                          No. 18-1471

MODEL SERVICE LLC d/b/a MSA MODELS, SUSAN LEVINE, WILLIAM IVERS,

*Defendants-Counter-Claimants-Appellees*.

---

For Appellant:                           CYRUS E. DUGGER, The Dugger Law Firm, PLLC, New York, NY.

For Appellees:                           EVAN J. SPELFOGEL, Phillips Nizer LLP, New York, NY; Matthew S. Aibel, Jeffrey H. Ruzal (on the brief), Epstein Becker & Green, P.C., New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Oetken, *J*.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **VACATED** and the case **REMANDED** for further proceedings.

Eva Agerbrink appeals the judgment of the United States District Court for the Southern District of New York (Oetken, *J*.) granting defendants' motion for summary judgment on the question of whether Agerbrink was misclassified as an independent contractor, rather than an employee, for purposes of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). For the following reasons, we conclude that there are genuine, material disputes of fact and so vacate that judgment and remand the case for trial on Agerbrink's misclassification claims. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

Eva Agerbrink is a fit model. Fit models do not pose for advertising campaigns or walk in runway shows—the work one might associate with a fashion model. Instead, fit models are hired based on their body proportions: clothing designers and apparel companies rely on fit models to test the fit of their designs. Model Service LLC (a/k/a MSA Models) is a model "management" company. J. App. 586. Susan Levine is MSA Models' President and Chief Executive; William Ivers is MSA Models' Chief Operating Officer. "MSA" refers to all Appellees.

On March 5, 2013, Agerbrink signed a three-year "management agreement" with MSA.[1] MSA helped Agerbrink "book" work by acting as a match-maker between Agerbrink and apparel

_____

[1] That agreement designates Agerbrink as an independent contractor. But "an employer's self-serving label of workers as independent contractors is not controlling." *Brock v. Superior*

2

companies seeking models with her dimensions. Generally, an apparel company would contact MSA when it needed a model, and, if Agerbrink fit the description, MSA would schedule her for an initial meeting with that company. If a company decided to engage Agerbrink for more appointments, it would contact MSA directly. Similarly, if a company decided it no longer wanted to work with Agerbrink, it would communicate that decision to MSA, rather than to Agerbrink. The reverse was also true: if Agerbrink no longer wanted to work with an apparel company, she would inform MSA who, in turn, would relay that information to the company.

As part of its exclusive management of Agerbrink's career, MSA collected payments for Agerbrink's modeling work directly from apparel companies. After taking its commission—usually twenty percent—MSA would then pay Agerbrink. Agerbrink's contract with MSA noted that she was to consult with MSA regarding compensation or compensation rates. MSA also managed Agerbrink's schedule. This management included: setting her appointment schedule for the work week ahead, emailing Agerbrink her daily schedule a day in advance, and communicating directly with an apparel company if Agerbrink was running late to an appointment.

Agerbrink asserts that MSA had near full control over her schedule. She testified that she would be told the following day's schedule less than 24 hours before she was scheduled to be at an appointment—often having to confirm the following day's schedule with an apparel company after MSA's offices were closed. J. App. 1647. MSA, meanwhile, asserts that "Agerbrink dictated her own schedule of when she would work with [a]pparel [c]ompanies." J. App. 1580. However, Agerbrink further testified that on the occasions where she communicated with apparel companies

---

*Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988). That designation, however, is "pertinent to the parties' beliefs about the nature of the relationship." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017). Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

directly she was required to relay any information regarding scheduling to MSA. *See* J. App. 1647. MSA, meanwhile, maintains that it was a neutral third-party, simply coordinating between Agerbrink and apparel companies.

Agerbrink asserts that MSA controlled all aspects of her pay and that she was not free to directly negotiate her own hourly rate. For example, she testified that she "never talked about [her] rate or [her] pay" with QVC, an apparel company with whom she had a standing appointment. J. App. 1676. She further testified that on one occasion, when she asked QVC if it had submitted payment to MSA because she had not received her compensation, QVC followed up with MSA. Conversely, MSA contends that "Agerbrink in her sole discretion decided whether to accept or reject the rate proposed by an [a]pparel [c]ompanies [sic], or to direct MSA to attempt to negotiate a better rate with the Apparel Company, or negotiate with the Apparel Company herself." J. App. 1588.

Agerbrink and MSA ended their relationship after Agerbrink was hired by an apparel company for an "in-house" position in June 2014. Agerbrink applied for that job directly, without going through MSA. The position involved fit modeling and office administrative work. When MSA found out that Agerbrink had been offered the position, it informed her that accepting the position would be a breach of her agreement with MSA. MSA threatened legal action but noted it would be willing to not pursue such action if Agerbrink, among other things, agreed to allow MSA to retain the nearly $18,000 of her wages it was holding, and instructed her new employer to remit twenty percent of her salary to MSA.

Agerbrink commenced this lawsuit, originally filed as a putative class action, against MSA on September 26, 2014, asserting claims under the FLSA and the NYLL, as well as a claim for unjust enrichment. On March 14, 2018, the district court granted MSA's motion for summary

4

judgment on the question of whether Agerbrink was MSA's employee for purposes of the FLSA and the NYLL. It also granted Agerbrink's motion for summary judgment on defendants' tortious interference claim and her motion for summary judgment as to initial damages on her unjust enrichment claim for withheld earnings (having previously granted summary judgment for Agerbrink on her unjust enrichment claim). The district court denied Agerbrink's motion for partial summary judgment on defendants' breach of contract counterclaim. On April 12, 2018, the parties agreed to voluntarily dismiss their remaining claims with prejudice. Judgment was entered on April 30, 2018. This appeal, on the misclassification issue alone, followed.

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review a decision on cross-motions for summary judgment *de novo*, examining each motion "on its own merits." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011). We must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (when considering cross-motions for summary judgment, "all reasonable inferences must be drawn against the party whose motion is under consideration"). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts,

5

determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008). This Circuit "has focused on the totality of the circumstances in addressing our ultimate concern whether, as a matter of economic reality, [a] worker[] depend[s] upon someone else's business for the opportunity to render service or [is] in business for [herself]." *Saleem*, 854 F.3d at 139. While we have identified several multi-factor tests related to this inquiry, *see, e.g.*, *Barfield*, 537 F.3d at 143, *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003), *Brock*, 840 F.2d at 1058-59, *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984), we recognize that "different sets of . . . factors" may be relevant "based on the factual challenges posed by particular cases," *Barfield*, 537 F.3d at 142. We have been clear that no single factor is dispositive and have "reiterate[d] the necessary flexibility of the economic realities test." *Id*. at 143.

There are genuine disputes of material facts presented in this case. When drawing inferences in the light most favorable to Agerbrink, which the district court did not do, a reasonable jury could have concluded that she was MSA's employee. While no single element of Agerbrink's and MSA's relationship is dispositive to the FLSA inquiry, *see supra*, there exist genuine disputes regarding Agerbrink's control over her work schedule, whether she had the ability to negotiate her pay rate, and, relatedly, her ability to accept or decline work. These disputes are significant as they relate both to the "degree of control" MSA exerted over Agerbrink and Agerbrink's "opportunity for profit or loss." *Brock*, 840 F.2d at 1058.

*First*: Agerbrink's schedule. MSA maintains that Agerbrink "set her own schedule and worked different weeks, days, and hours for a variety of reasons, all of which were her own." Appellees' Br. at 31; *see* J. App. 1791 (Deposition of Susan Levine: "whatever [Agerbrink] wanted to do, she could accept"). Meanwhile, Agerbrink asserts that MSA "coordinated all scheduling of

6

[her] work with apparel clients and maintained [her] master schedule[].” Appellant’s Br. at 19; *see* J. App. 1621 (Excerpts of Agerbrink Deposition: “The agent is in total control of the model. . . . We are not in charge of our schedule. They tell us we have to report everything we do to them.”). Agerbrink concedes that she would contact a company directly to confirm specifics of an appointment time, but only after it was already set by MSA and the apparel company.

At this stage, the dispute should not have been resolved in MSA’s favor. The district court concluded that “Agerbrink could set her own work schedule and choose how much to work, if at all.” Special App. 7; *see also id.* at 10 (“Agerbrink had significant leeway in deciding whether to work, when to work, for whom to work, and for how much to work.”). In a footnote, the district court noted that Agerbrink “contends that she had to keep her scheduled standing appointments and might have been penalized if she did not show up at the scheduled time.” *Id.* at 7 n.1. The district court discounted Agerbrink’s contention because “she also had the freedom to end her standing appointments, as she did with QVC.” *Id.* But the record reflects that ending a standing appointment was not as easily done as said: Agerbrink was instructed that she had to give MSA notice of her departure, and in turn MSA would give QVC, “3 weeks notice in order to replace [her].” J. App. 1058. Agerbrink “set forth specific facts demonstrating that there is a genuine issue for trial,” *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009), on the issue of whether she was able to independently manage her work schedule.

*Second*: Agerbrink’s pay. Agerbrink asserts that she had no control over negotiating the amount an apparel company would pay for her services and that she was actively discouraged from discussing compensation with apparel companies. In fact, Agerbrink’s primary manager at MSA once emailed Agerbrink to relay QVC’s complaints about Agerbrink’s discussion of her rate of pay, noting that “[t]hese details are private between [Agerbrink] and MSA.” J. App. 1869. MSA,

7

meanwhile, asserts that "Agerbrink alone determined her booking rates." Appellees' Br. at 42. MSA argues that, because "[t]he model has the right to say yes and the model has the right to say no," J. App. 1737, MSA does "not dictate [a model's] compensation," Appellees' Br. at 42.

The district court improperly resolved this dispute in MSA's favor. It concluded that "Agerbrink had the ultimate say about her hourly rate." Special App. 8. In support of this conclusion, the district court explained that Agerbrink could accept a lower hourly rate if "she really wanted a certain job," or, conversely, "she could hold out for her usual rate." *Id.* This "take it or leave it" approach, taken to its logical conclusion, means that *any* person has "the ultimate say" about her pay because any person has the binary choice to either work for the amount offered or not to work for that amount. It says nothing of the power to negotiate a rate of pay. The district court recognized that only MSA, not Agerbrink, attempted to negotiate for a higher rate with QVC. Special App. 4. What's more, Agerbrink testified that the binary choice to accept or reject a booking was a choice in theory only: "You never turn down a booking. . . . It's crazy to do." J. App. 1684; *see Saleem*, 854 F.3d at 142 ("To be clear, pursuant to the economic reality test, it is not what Plaintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive."). Therefore, the issue of whether MSA "determined [Agerbrink's] rate . . . of payment," *Carter*, 753 F.2d at 12, is disputed.

As the district court properly noted, independence to determine her schedule and income are key inquiries to determining "whether, as a matter of economic reality" Agerbrink "depended upon" MSA's "business for the opportunity to render service" or was "in business for" herself. Special App. 12 (quoting *Brock*, 840 F.2d at 1059). These are material facts. They are in dispute. As such, summary judgment was not proper on the question of whether Agerbrink was an

8

employee under the FLSA.[2] Similarly, Agerbrink was not entitled to summary judgment on that same question.

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** the case for trial on the misclassification claims.[3]

**FOR THE COURT:**
Catherine O'Hagan Wolfe, Clerk

---

[2] Similarly, it was premature to resolve the question of whether Agerbrink was an employee under the NYLL. As the district court pointed out, the "NYLL test is similar to the FLSA test, although it focuses more on degree of control than economic reality." Special App. 13; *see Bynog v. Cipriani Grp.*, 802 N.E.2d 1090, 1093 (N.Y. 2003) (laying out the factors considered for NYLL's degree of control inquiry). The disputed facts relate directly to the degree of control Agerbrink exercised and thus summary judgment should not have been granted on her NYLL claims.

[3] In remanding, we also instruct the district court to consider whether its rulings concerning the sealing of documents and other material have satisfied its obligation to "review . . . documents individually and produce specific, on-the-record findings that sealing is necessary to preserve higher values." *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019); *see generally Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).