15-88-cv
*Mazhar Saleem, et al. v. Corporate Transportation Group, Ltd., et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

September Term 2015

(Argued: February 5, 2016            Decided: April 12, 2017)

No. 15-88-cv

_____

MAZHAR SALEEM, Individually and on behalf of all others similarly situated, JAGJIT SINGH, Individually and on behalf of all others similarly situated, ANJUM ALI, MALOOK SINGH, CARLOTA BRIONES, JAIRO BAUTISTA, JOSE CABRERA, MARLENE PINEDO, MIRIAM SOLORZANO, MOHAMMAD MIAN, MOHAMMAD SIDDIQUI, S. PEDRO DUMAN, RAJAN KAPOOR, WILMAN MARTINEZ, JOSE SOLORZANO, LUIS A. PEREZ, RANJIT S. BHULLAR, LUIS M. SANCHEZ, ANWAR BHATTI, AVNEET KOURA, MAHER MAQSOOD, ATIF RAZAQ, BHAVESH SHAH, KHUSHWANT SINGH, JAMSHED CHOUDHRY, AZIZ URREHMAN, HASAN KHALBASH, PETER PANZICA, ROBINSON MATA, HILARIO A. SANCHEZ, MANSOR AHMED RANA, BAUDWIN KOURI, ALEXIS S. GACIA-ALBERTO, MUHAMMAD I. CHOUDHRY, ANA M. HERRA, MARISOL ESPINAL, WALID HAMEHO, ALEXANDER SCHWALLB, ERIC JARMON, KEITH DANIEL, RAFAEL RIJO, BABAB HAFEEZ, NORMAN LEVINE, MARIO GUERRERO BATANTA, LIANG HUA MA, WILLIAM MARTINEZ, MOHAMMED A. MUSA, KERRY BOBB, HARJAR RAHMAN, ELPIDIO HELENA, TAMER RASHDAN, MENA MICHAEL, FELIX L. CARABALLO, MARK SHINDER, JOHN M. HIDALGO, ODISHI, INC., KIRK HAYDEN, BARTOLOME ROSARIO, LUIS VASQUEZ, IRFAN SHAFI, MOHAMMAD A. SIDDIQUI, WADE QUASHIE, JIMMY CHEN, JEFF M. GRAVESANDE, EDISSON BARROS, ANDRZEJ OLECHNOWICZ, NICK WIJESINGHE, (Point to Point Car & Limo Inc.), JACK GOLDEN, FIROZ AHMED, PAUL GLIBAUSKAS, FELIX A. PAULINO, JUAN DE LOS SANTOS, CHOWDHURY ANOWAR, ZONG RONG ZHU, MOHAMMED GAZI ALI, MEI YAO LIU, KATELYN SANTOS, JOSE JAIMES, IBRAHIM DESOOKI, DONGSEDG YOO, JORGE MONAKS, MALIK HUSSAIN, MARCOS MENDEZ, LUIS AUCAPINA, ANDERSON GONZALEZ, TOWON STEWART,

FERAS ISSA, LENKIN PANTALEON, EDGAR AUCAPINA, CELSTINO MONTERO, MIKHAIL GERBER, ZYDAN ELNAHAR, DEXTER PUSEY, RANGDEU MULTANI, SATNAM SINGH, XIANGBO LI, HUANG XIONG JIE, RAFAEL A. RISO, ISMAEL MEJIA, KULDIP SINGH, JAN A. KALDA, JEEWAN SINAH, WILSON A. SANTOS, SOHAN SINGH GILL, EUCLIDES PENA, LESTER C. MCDONALD, NORMAN HO, GENNADI PETROVSKI, SATNAM SINGH, ZENXIN WANG, NOBLE YOUNG, FRANCOIS FAN-FAN, MUHAMMAD I. CHOUDHRY, FABIAN MARTINEZ, KONSTANTIN KATZ, RAFAEL OSORIA, NWALA GABRIEL, JOSE M. SOLORZANO, UBALDO DE LOS SANTOS, HARRIKISSOON SEEJATTAN, HARJAR RAHMAN, ADEL ELKAZAZ, PEDRO M. PIASENCIA, KHORSHED ALAM, GARNELL WRIGHTEN, REFAT BHUIYAN, LEO K. STEWART, JEFF M. GRAVESANDE, AHMED NISAR, DANJIT SINGH, HUMAYUN KABIR HUSSAIN, MOHAMMED A. MUSA, HARNEK SINGH WHAR, SHASHI BHATIA, GOGINDER SINGH, ABDELILAH ELKARHAT, MANINDER SINGH, JO GINDER-SINGH, WILMAN MARTINEZ, HARVINDER KHAMRA, DAVID A. SANCHEZ, SYED FIROZUDDIN, DARIUSZ RYDZEWSKI, YASAR KAHRAMAN, ALI GAZI MOHAMMED, AHMED M. BAKIER, ONRIS DE LA ROSA, HARVINDER S. BHAMRA, IMTIAZ H. QUERESHI, DAMIR, AHMED ISMAIL, MUNISH KUMAR, PAUL GLADKEVITCH, TARLOCMAN PAL SINGH, (T.P), ADAM KLAG, AL WONG ZHANG, MUSTAPHA RAHMOUWI, MAHAMMAD ALI SIDDIQUE, SHENG ZHANG LU, GUSTAVO GARCIA, ASHWIN KUMAR, INDERJIT SINGH, MAN CHENG, BALWINDER SINGH, JAWAID KAYANI, SUKHDEV SINGH, FERNANDO AVENDANO, XIONG WEI MI, MOHAMMAD ISLAM, DONGSEOG YOU, TAOJOCHAN SIHGH, RATIC SHIVIONOV, JAGDISH KAL, GABRIEL PIZHA, ANOMWAR I. CHOWDHURY, SAMSON LIAU, NESTOR TERAN, RAJAN DODEJA, SOCRATES GREGORIADIS, SAAD ATTIA, ANTHONY KHAN, RAMON A. ALMONTE, BADLANI PRAKASH, JUAN A. SOTO, MUNJED SHABANEH, JOSE SOLORE, JOSE M.S., ROXANA A. ZETINO, IRFAN SHAFI, ARCELIA BARROS, CHEUNG YEUNG, POINT TO POINT CAR & LIMO, INC., VISHAMBER TUKREL, YING TIAN LEI, MIKHAIL ZEMKO, TAHIR AZIZ, WEN ZHONG LI, KE GENG SHI, N. WESESINGHE, CHRISTINA SANCHEZ MONTERO, KULYK OLEG, ARIEL RESTITUYO, SHUHRAT KHAKBERDIYER, ANGEL M. GAYA, BAYRAM ONBASI, JORGE CONTRERAS, JUAN C. MOGROVEJO, XUN LI FAN, SAMEH S. BASILY, JOSE PINTO, RAMADAN S. KENAWI, DONAVAN JAMES, IBRAHIM ONBASI, AMANDA SINGH, SULEYMAN ISSI, WAZIR MUGHAL, ETIENNE TCHITCHUI, DIOGENES PION, IJAZ MAHBOOB, PEDRO PAZMINO, JING JING WANG, AZID RIAZ, GURMAIL SINGH, ASAND FARA, LAWRENCE CALLISTE, GUO BAO XUAM, JEETU MULTANI, KING WAH YIU, ANJUM ALI, GURMAIL SINGH,

AHMED ALJAHMI, BUO XUAN GUO, AMERICAN CAR LIMO TOURS, INC., MOHAMED ABDELAAL, KHEMLHAND KALIKA, MUNISH KUMAR, SHAHIDULLAH DULAL,

*Plaintiffs-Appellants*,

-v.-

CORPORATE TRANSPORTATION GROUP, LTD., CORPORATE TRANSPORTATION GROUP INTERNATIONAL, CORPORATE TRANSPORTATION GROUP WORLDWIDE, INC., NYC 2-WAY INTERNATIONAL, LTD., ALLSTATE CAR & LIMOUSINE, INC., ARISTA CAR & LIMOUSINE, LTD., TWR CAR & LIMOUSINE SERVICE, LTD., EXCELSIOR CAR AND LIMOUSINE, INC., HYBRID LIMO EXPRESS, INC., EDUARD SLININ, GALINA SLININ,

*Defendants-Appellees*.[*]

_____

Before: LEVAL, LIVINGSTON, AND CARNEY, *Circuit Judges*.

Plaintiffs-Appellants, black-car drivers in the greater New York City area affiliated with Defendants-Appellees, owners of black-car "base licenses" and related entities, appeal from the September 24, 2014 judgment of the United States District Court for the Southern District of New York (Furman, *J.*) granting Defendants' motion for summary judgment, rejecting Plaintiffs' claim that they are "employees," rather than "independent contractors," within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* For the reasons stated below, we **AFFIRM** the judgment of the district court.

> RACHEL M. BIEN, Outten & Golden LLP, New York, N.Y. (Michael N. Litrownik, Michael J. Scimone, Outten & Golden LLP, New York, N.Y.; Stephen H. Kahn, Kahn Opton LLP, Fort Lee, N.J., *on the brief*), *for Plaintiffs-Appellants*.

---

[*] The Clerk of the Court is directed to amend the caption of the case.

EVAN J. SPELFOGEL, Epstein Becker & Green, P.C., New York, N.Y., (Samuel Estreicher, New York, N.Y., *on the brief*), *for Defendants-Appellees.*

JESSE ZVI GRAUMAN (M. Patricia Smith, Jennifer S. Brand, Paul L. Frieden, *on the brief*), U.S. Department of Labor, Office of the Solicitor, Washington, D.C., *for Amicus Curiae the Secretary of Labor.*

Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C.; Catherine K. Ruckelshaus, National Employment Law Project, New York, NY, for *Amici Curiae The National Employment Law Project, National Employment Lawyers' Association, Legal Aid Society of New York, The Urban Justice Center, and Make the Road New York.*

RICHARD H. DOLAN (Wayne I. Baden and Elizabeth Wolstein, *on the brief*), Schlam Stone & Dolan LLP, New York, N.Y., for *Amicus Curiae Black Car Assistance Corporation.*

Steven G. Mintz, Jeffrey D. Pollack, Mintz & Gold LLP, New York, N.Y., *for Amici Curiae Mark Malchikov, Pavel Borisov, Anton Sirouka, Alex Borden, Vleriy Vishin, Michael Baier, and Josef Nusenvaum.*

WARREN POSTMAN, U.S. Chamber Litigation Center, Inc., Washington, D.C., (Michael J. Gray, Brent D. Knight, Jones Day, Chicago, Ill., *on the brief*), for *Amicus Curiae the Chamber of Commerce of the United States of America.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Plaintiffs-Appellants ("Plaintiffs"), black-car drivers in the greater New York City area, brought this action in the United States District Court for the Southern District of New York, asserting claims against Defendants-Appellees ("Defendants"), owners of black-car "base licenses" and affiliated entities, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York State Labor Law ("NYLL"), N.Y. Lab. Law § 650 *et seq.*, for, *inter alia*, unpaid overtime. The district court (Furman, *Judge*), after conditionally certifying a collective action under the FLSA, granted Defendants' motion for summary judgment on both the FLSA and NYLL claims as to both the named and opt-in Plaintiffs, concluding that "as a matter of law, Plaintiffs are properly classified as independent contractors rather than employees" for purposes of both statutes. *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 543, 545 (S.D.N.Y. 2014). We agree with the district court that, "even when the historical facts and the relevant factors are viewed in the light most favorable" to Plaintiffs, they constitute independent contractors for FLSA purposes as a matter of law.[1]

---

[1] Although Plaintiffs appealed from the district court's September 24, 2014 grant of summary judgment as to their FLSA and NYLL claims, Plaintiffs' briefs on appeal make no mention of the NYLL, and instead focus exclusively on the FLSA. Accordingly, we deem Plaintiffs' NYLL claims waived for purposes of this appeal. *See*

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 144 (2d Cir. 2008).

Accordingly, we affirm the judgment of the district court.

**BACKGROUND**

**I. Facts[2]**

Plaintiffs are black-car drivers in the tri-state area who owned or operated black-car franchises and were affiliated with Defendants.[3] Six Defendants (collectively, "Franchisor Defendants") each own a "base license" that allows them to operate a black-car dispatch base in New York City, and to sell franchises to individual drivers.[4] *See* 35 R.C.N.Y. § 59A-03(c). The remaining three Defendants are various incarnations of the "Corporate Transportation

---

*Hughes v. Bricklayers & Allied Craftworkers Local No. 45*, 386 F.3d 101, 104 n.1 (2d Cir. 2004).

[2] Except as otherwise noted, the following facts are undisputed.

[3] Black cars are a type of for-hire vehicle (along with livery vehicles and limousines) that provide ground transportation by prearrangement with customers. Black cars are dispatched by — and must be affiliated with — bases specific to their vehicle type. Rules of the City of New York ("R.C.N.Y."), Tit. 35 §§ 59A-03(e), -04(h)–(i). While the rules defining livery and limousine bases do not specify who may own affiliated vehicles, black cars affiliated with a black-car dispatch base must be owned "by Franchisees of the Base or . . . members of a cooperative that operates the Base." *Compare id.* §§ 59A-03(b)–(c) *with id.* §§ 59A-03(j)–(m).

[4] These Defendants are NYC 2-Way International, Ltd. ("NYC 2-Way"); AllState Private Car & Limousine ("AllState"); TWR Car and Limo, Ltd. ("TWR"); Excelsior Car and Limo, Inc. ("Excelsior"); and Hybrid Limo Express, Inc. ("Hybrid").

Group" (collectively, "CTG"), which provides administrative support for the operation of the Franchisor Defendants' dispatch bases (as well as for 126 other for-hire vehicle enterprises) by handling, *inter alia*, billing, referral, payment, bookkeeping, accounting, voucher processing, and dispatching.[5] The Franchisor Defendants and CTG operate out of a single facility in Brooklyn and constitute "a single integrated enterprise and/or joint employer for the purposes of the [FLSA]." Joint Appendix ["J.A."] 1317. Among the approximately 70 people employed in CTG's dispatch unit at the time relevant here, 40 were in billing, six or seven were in customer service, five were in driver relations, and at least two were in sales.[6] There were roughly 700 black cars affiliated with the Franchisor Defendants' dispatch bases and operating under the CTG umbrella. CTG's clients were primarily corporate entities, such as Deutsche Bank and Bank of America.

---

[5] These three Defendants are Corporate Transportation Group, Ltd.; Corporate Transportation Group International; and Corporate Transportation Group Worldwide, Inc. Individually named Defendant Eduard Slinin is the president of these companies. He and his wife, Galina Slinin, are also controlling shareholders in some of the Franchisor Defendants.

[6] CTG's employees, unlike Plaintiffs, are issued W-2 Forms which document their pay.

7

The named Plaintiffs rented or purchased their franchises directly from the Franchisor Defendants or, in some cases, from other franchisees.[7] Plaintiffs who rented franchises paid $130 to $150 per week, while Plaintiffs who purchased their franchises directly from a Franchisor Defendant did so pursuant to franchise agreements, which required them to pay franchise fees ranging from a nominal amount (or even nothing) to as much as $60,000. The franchise agreements also required franchisees to pay additional fees, some upfront and some recurring, which varied from agreement to agreement. (For example, in exchange for a high upfront fee, "Platinum" franchises offered by certain Franchisor Defendants provided for a significantly lower voucher processing fee — the percentage of a fare charged to a driver for payment processing — than their free "Gold" franchises. *See* J.A. 743, 752.) Franchisees also had to obtain a New York City Taxi & Limousine Commission ("TLC") license, insurance, and a vehicle which they were responsible for maintaining.

Plaintiffs' franchise agreements describe the nature of the relationship between franchisor and franchisee as follows:

---

[7] Notably, some drivers of black-car vehicles neither owned nor rented a franchise, but instead drove for other black-car drivers who themselves owned or rented a franchise.

8

Franchisee is not an employee or agent of Franchisor, but merely a subscriber to the services offered by Franchisor. Franchisee shall at all times be free from the control or direction of Franchisor in the operation of Franchisee's business, and Franchisor shall not control, supervise or direct the services to be performed by Franchisee.

J.A. 732. Each franchise agreement also contains a "non-compete" provision which prohibited CTG-affiliated drivers from driving CTG customers "without processing payment for such services through CTG." J.A. 3477–79. Failure to comply with this and other terms was grounds for termination of the franchise. Significantly, however, the franchise agreements did not prohibit drivers from transporting non-CTG customers for a competitor black-car company, or independently, during their affiliation with CTG.[8]

The franchise agreements also required that drivers comply with "Rulebooks" — manuals setting out certain standards of conduct — specific to each Franchisor Defendant.[9] The Rulebooks forbid, for instance, harassing customers or other drivers and submitting fraudulent vouchers. The Rulebooks

---

[8] While TLC regulations require that for-hire drivers be affiliated with one, and only one, dispatch base, 35 R.C.N.Y. § 59A-04(h)–(i), they may legally accept work from another dispatch base (provided certain disclosures are made to the customer), *see* 35 R.C.N.Y. § 59A-11(e).

[9] The parties dispute CTG's role in formulating the rules contained within the Rulebooks.

also include a dress code, which required drivers to dress neatly in specified business attire, as well as guidelines for keeping vehicles clean. Drivers were not required to wear a uniform, however, or to mark their cars with insignia denoting an affiliation with the Defendants.

The Rulebooks were enforced by each Franchisor Defendant's Security Committee, each of which was composed entirely of drivers who served elected terms. Security Committees could hold hearings on complaints and suspected violations. If a Security Committee determined that a driver had broken a rule, it could impose a monetary penalty on the driver, temporarily suspend the driver, or even terminate the driver's franchise agreement. Although it is undisputed that drivers elected the members of the Security Committees, the parties dispute whether CTG exercised influence over the Committees.

During their affiliation with the Defendants, Plaintiffs, like other drivers in the CTG network, possessed considerable autonomy in their day-to-day affairs. Drivers could, for example, choose among three principal ways of securing fares for driving CTG customers. First, they could wait in a physical queue of cars outside certain high-volume CTG clients' businesses. Second, they could elect to drive under a CTG contract with the New York City Metropolitan Transport

Authority ("MTA"), transporting by prearrangement clients who were unable to travel via public transportation.[10] Third, drivers could access CTG's proprietary black-car dispatch system, through which CTG transmitted requests for service from servers in a dispatch room to an application ("app") on drivers' smart phones.[11] In all three cases, clients provided vouchers to the driver transporting them in lieu of cash payment, and these vouchers were thereafter processed by CTG.

Drivers also determined when and how often to drive, and the record reflects that they worked vastly different amounts of time, without providing any notice to Defendants.[12] Plaintiffs likewise chose which area in which to

---

[10] During the period relevant to this litigation, drivers desiring MTA work informed CTG of the block of time and the zone in which they wished to work on a given day, and CTG's computerized dispatch system matched the drivers with available assignments. Notably, because the MTA paid less for jobs under its contract with CTG than many of CTG's other accounts did (as set forth below), CTG was not always able to provide sufficient drivers, notwithstanding its relationship with Plaintiffs and other black-car drivers. On such occasions, CTG reached out to other companies for assistance.

[11] Black-car drivers signaled their availability to work by consulting the smart phone app (which permitted them to see both how many jobs were available and how many other affiliated drivers were operating in particular "zones" in the City), choosing a zone, and "booking into" it.

[12] Jagjit Singh, for instance, testified that he worked seven days a week, sometimes as much as 15 to 16 hours a day, J.A. 4789, while Anjum Ali typically worked

11

work, and they were at liberty to — and did — accept or decline jobs that were offered.[13]  Significantly, Plaintiffs also could — and did — drive for dispatch bases other than the one with which they were affiliated, and they were thus free to shift as they chose during the workday from one dispatch service to another. Most of the named Plaintiffs drove for other black-car companies regularly, and some earned substantial sums as a result.[14]  Some drivers also transported — and

---

about eight hours a day, from around 4:00 p.m. until approximately midnight, J.A. 3303–04.

[13] When a driver "logged in" to the dispatch system, he saw how many jobs were available and how many other drivers were booked into each "zone" in New York City. The driver then decided which zone to "book into."  Having chosen a zone, the driver was placed at the end of a virtual queue, where he waited until a work offer appeared on his phone.  Once an offer appeared, the driver had 45 seconds to accept or decline the job.  If the driver rejected the job, he would be booked out of the app for five minutes and, after booking in again, placed at the end of the queue.  After accepting a job, the driver received the pickup address, passenger's name, destination, rate of the fare, and the CTG account number associated with the passenger.  Even with this information in hand, however, the driver could "bail out," *i.e.*, decline to complete the job.  After a "bailout," the driver was not permitted to log into the dispatch system for one to three hours.

Once a driver picked up a client, he was free to choose the route to that client's destination.  When the driver completed the trip, he asked the customer to sign a voucher.  The driver then dropped off the voucher at CTG's facility in Brooklyn at his or her convenience — there appears to have been no time limit — and CTG processed vouchers daily, weekly, or every three weeks, according to the driver's preference.

[14] Ranjit Bhullar, for instance, earned $395,081.90 driving for "Exec. Charge" from 2006 to 2008, and Malook Singh earned $206,568.71 driving for "Elite" from 2006 to 2009.  J.A. 3436–38.

12

were paid directly by — customers with whom they had made individual arrangements, and others, though it was contrary to TLC regulations, *see* 35 R.C.N.Y. § 59B-25(a), picked up street hails.[15]

Although CTG negotiated rates with its clients, supplied the proprietary dispatch technology, and operated the dispatch system, the record suggests that Plaintiffs took home the majority — in some cases up to 85% — of each CTG fare, less some small additional fees. On this basis, Plaintiffs classified themselves as independent contractors on their tax returns and took substantial business deductions.

## II. Procedural History

On November 19, 2012, Plaintiffs Mazhar Saleem and Jagjit Singh filed a complaint in district court, seeking to recover unpaid overtime and other wages under the FLSA and the NYLL on behalf of a class of similarly situated drivers. On June 17, 2013, the district court conditionally certified a collective action pursuant to Section 216(b) of the FLSA, 29 U.S.C. § 216(b), and approved a notice to be sent to potential opt-in plaintiffs. The court subsequently denied class

---

[15] Drivers generally collected payment for such services themselves, sometimes through accounts established with credit card merchant companies. The record indicates that some Plaintiffs earned significant sums in this way – one driver, for instance, processed over $70,000 through a credit card merchant service account in an 18-month period. J.A. 5427–56.

certification of their NYLL claims, a determination not before us on appeal. *Saleem v. Corp. Transp. Grp., Ltd.*, No. 12 Civ. 8450(JMF), 2013 WL 6061340, at *7 (S.D.N.Y. Nov. 15, 2013).

On September 16, 2014, Judge Furman granted Defendants' motion for summary judgment and denied Plaintiffs' motion for partial summary judgment as to both the named Plaintiffs and those Plaintiffs who had opted into the collective action. *Saleem*, 52 F. Supp. 3d at 545. In concluding that Defendants were entitled to summary judgment because Plaintiffs were not, as a matter of law, employees of Defendants for FLSA purposes, the district court applied the five factors enumerated by this Court in *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988), analyzing each factor individually and considering whether the "totality of the circumstances" suggested that Plaintiffs were "employees" or "independent contractors," *Saleem*, 52 F. Supp. 3d at 535–36, 544. The district court concluded that "[n]otwithstanding that the final [*Superior Care*] factor," the degree to which employees are integral to a business, "favors employment status," "[w]eighing all of the [*Superior Care*] factors and

14

considering the totality of the circumstances," "the drivers here fall into the [independent contractor] category as a matter of law."[16]  *Id*.

On January 6, 2015, Plaintiffs timely appealed.

## DISCUSSION

## I.

We review the district court's grant of summary judgment *de novo*, and we will affirm only if the evidence, when viewed in the light most favorable to the party against whom it was entered, demonstrates that there is no genuine issue as to any material fact and that judgment was warranted as a matter of law. *Barfield*, 537 F.3d at 140 ; *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).  Here, we examine the district court's conclusion that, "as a matter of law, Plaintiffs are properly classified as independent contractors rather than employees for purposes of the FLSA."  *Saleem*, 52 F. Supp. 3d at 543.  We begin, then, with a brief explication of our case law, as is relevant to this distinction.

---

[16] The district court also rejected Plaintiffs' claim that the drivers were "employees" within the meaning of the NYLL.  Because the factors for determining whether an individual is an "employee" under the NYLL are similar to the *Superior Care* factors, the court referred to much of its FLSA analysis in concluding that "all five NYLL factors favor independent contractor status."  *Saleem*, 52 F. Supp. 3d at 545.  This part of the ruling, concerning whether Plaintiffs constitute "employees" under the NYLL, is not at issue in the present appeal.

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "An entity 'employs' an individual under the FLSA" if it "'suffer[s] or permit[s] that individual to work.'"[17] *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (alterations in original) (quoting 29 U.S.C. § 203(g)); *see also* 29 U.S.C. § 203(d) (defining "employer" as "any person acting directly or indirectly in the interest of any employer in relation to an employee"). In light of the definition's circularity, courts have endeavored to distinguish between employees and independent contractors based on factors crafted to shed light on the underlying economic reality of the relationship.[18] As the district court recognized, this Court has focused on "the totality of the circumstances" in addressing our "ultimate concern . . . whether, as a matter of economic reality, the workers depend upon someone else's business for the

---

[17] The Supreme Court has noted that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

[18] This Court has devised many such "economic reality" tests in the context of the FLSA. *See, e.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534–38 (2d Cir. 2016) (distinguishing "interns" from "employees" under the FLSA); *Barfield*, 537 F.3d at 140–50 (determining whether entity qualifies as "joint employer" under the FLSA); *Zheng*, 355 F.3d at 66–71 (same); *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12–15 (2d Cir. 1984) (determining whether outside entity constitutes an "employer" of prison inmate pursuant to the FLSA).

16

opportunity to render service or are in business for themselves." *Superior Care*, 840 F.2d at 1059; *see also Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) ("'[E]conomic reality' rather than 'technical concepts' is to be the test of employment." (quoting *United States v. Silk*, 331 U.S. 704, 713 (1947))); *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service.").

Our case law has identified certain factors, first set out in *Silk*, 331 U.S. at 716, as relevant to separating employees from independent contractors in the context of the FLSA,[19] *see Superior Care*, 840 F.2d at 1058–59. Nevertheless, "[t]hese factors are merely aids to analysis," *Thibault v. Bellsouth Telecomms., Inc.*,

---

[19] In *Silk*, the Supreme Court addressed whether truck drivers in two consolidated cases constituted "employees" for the purpose of the Social Security Act. *Silk* set out the following factors as relevant to this determination:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Superior Care*, 840 F.2d at 1058–59 (citing *Silk*, 331 U.S. at 716). "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts — whether workers are employees or independent contractors—is a question of law." *Id*. at 1059.

612 F.3d 843, 846 (5th Cir. 2010), and are helpful only insofar as they elucidate the "economic reality" of the arrangement at issue, *Superior Care*, 840 F.2d at 1059. Relevant FLSA precedent, despite endorsing the *Silk* factors, cautions against their "mechanical application." *Id*. As we stated in *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d at 141, "[t]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' . . . determined by reference not to 'isolated factors but rather upon the circumstances of the whole activity,'" (citation omitted) (first quoting *Goldberg*, 366 U.S. at 33, and then quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).[20] Thus, while the following discussion draws upon and discusses the *Silk* factors where relevant, it trains on the "ultimate question": the economic reality of Plaintiffs' relationship with CTG.

---

[20] This caution is merited because the *Silk* factors, while helpful in identifying relevant facts, overlap to a substantial degree. For instance, at least in the abstract, the more substantial the "control" (factor one) a company asserts, the less "initiative" (factor three) it allows on the part of its workers. In addition, the same facts are often relevant to multiple *Silk* factors. In *Superior Care*, for example, we categorized the fact that the alleged employer "unilaterally dictated the nurses' hourly wage [and] limited working hours to 40 per week where nurses claimed they were owed overtime" as indicative of the extent of defendant Superior Care's control over its workers. 840 F.2d at 1060. But this fact was similarly indicative of the scarce "opportunit[ies] for profit or loss" available to the nurses in that case.

## II.

Upon *de novo* review, "even when the historical facts and the relevant factors are viewed in the light most favorable" to Plaintiffs, *id*. at 144, and despite the broad sweep of the FLSA's definition of "employee," *Darden*, 503 U.S. at 326, the record here does not permit the conclusion that Plaintiffs were employees, but instead establishes that they were in business for themselves. As discussed below, Plaintiffs independently determined (1) the manner and extent of their affiliation with CTG; (2) whether to work exclusively for CTG accounts or provide rides for CTG's rivals' clients and/or develop business of their own; (3) the degree to which they would invest in their driving businesses; and (4) when, where, and how regularly to provide rides for CTG clients. While none of these facts is determinative on its own, considered as a whole with the goal of discerning the underlying economic reality of the relationship here, the district court correctly determined that Plaintiffs are, as a matter of law, "properly classified as independent contractors rather than employees for purposes of the FLSA." *Saleem*, 52 F. Supp. 3d at 543. As a result, Defendants were properly granted summary judgment.

19

## A. Affiliation with CTG

From the start, Plaintiffs were "driver-owners" who made significant decisions regarding the operation of their small businesses. *Silk*, 331 U.S. at 719. Plaintiffs chose not only to enter into a franchise agreement with a CTG Franchisor Defendant instead of seeking more conventional employment, but also exercised considerable discretion in choosing the nature and parameters of that affiliation. Some Plaintiffs elected to purchase a franchise, either directly from a Franchisor Defendant or on the secondary market, while others opted to rent one. Further, because the franchise agreements contained different terms, and particularly because there was wide variation in both the price of the franchises and the fees associated with using them, Plaintiffs had to strike a balance between a franchise's upfront cost and the favorability of its terms, a choice which ultimately affected its profitability.

The franchise agreements' termination provisions also are indicative of Plaintiffs' independence. While Plaintiffs could reassess their choice to affiliate with CTG (not to mention the nature of that affiliation) and "terminate the [franchise] agreements" as they pleased,[21] *Saleem*, 52 F. Supp. 3d at 542, the terms

---

[21] The franchise agreements did provide that drivers receive franchisors' "prior written consent . . . , which consent [could] not be unreasonably withheld," before

of the agreements committed the Franchisor Defendants to maintaining them for substantial durations, or even indefinitely, absent Plaintiffs' breach of those terms. Because Plaintiffs were free to drive for competitors, for personal clients, or not at all without violating their franchise agreements, the termination provisions constituted a significant restriction on the ability of Franchisor Defendants to exercise control.

In addition, each of Plaintiffs' agreements also designated them as independent contractors, and some Plaintiffs formed corporations to operate their franchises. "Though an employer's self-serving label of workers as independent contractors is not controlling," *Superior Care*, 840 F.2d at 1059; *see also Thibault*, 612 F.3d at 845–46 (noting that "contractual designation of the worker as an independent contractor is not *necessarily* controlling" (emphasis added)), such a designation in the franchise agreement is pertinent to "the parties' beliefs about the nature of the relationship," *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 564 (7th Cir. 2009); *see also Johnson v. City of Saline*, 151 F.3d 564, 568-69 (6th Cir. 1998) (observing, in ADA case, that "the contractual relationship reads unmistakably as one with an independent

---

leasing or renting a franchise. *See, e.g.,* J.A. 3377. It is not clear whether this requirement was enforced in practice.

contractor as opposed to one with an employee").[22]  Thus, in the language of the *Silk* factors, Plaintiffs demonstrated independence and initiative in selecting franchise agreements that best fit their business plans, and in choosing — independent of Franchisor Defendants —to persist in those affiliations, all of which suggests, in the circumstances of this case, that Plaintiffs were "in business for themselves."  *Superior Care*, 840 F.2d at 1058–59.

## B.  *Entrepreneurial Opportunities*

The fact that Plaintiffs could (and did) work for CTG's business rivals and transport personal clients while simultaneously maintaining their franchises without consequence suggests, in two respects, that CTG exercised minimal control over Plaintiffs.  First, on its face, a company relinquishes control over its workers when it permits them to work for its competitors.  Second, when an individual is able to draw income through work for others, he is less economically dependent on his putative employer.  This lack of control, while

---

[22] In this vein, CTG issued Plaintiffs 1099 Forms, not W-2 Forms, and Plaintiffs classified themselves as independent contractors for tax purposes and took deductions for business expenses.  Likewise, Plaintiffs did not receive health insurance, 401(k), retirement, or other benefits.  *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998) (affirming finding of independent contractor status when, *inter alia*, the worker "did not have the company withhold income or Social Security taxes [and] did not receive employee benefits such as health insurance").

not dispositive, weighs in favor of independent contractor status. *See, e.g., Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) ("If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor."); *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (noting fact that "[t]he drivers can work for other courier delivery systems" supported independent contractor status); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998) (affirming finding of independent contractor status when, *inter alia*, the worker "was allowed to sell merchandise on behalf of other companies"); *see also Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006) (per curiam) (affirming district court's finding that worker's ability "to take jobs from" competitors, and to "take as many or as few jobs as he desired," supported district court's conclusion that there was not a "significant degree of permanence" in the relationship at issue); *cf., e.g., Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (stating that, generally speaking, "'[e]mployees' usually work for only one employer and such relationship is continuous and indefinite in duration" (quoting *Dole v. Snell*, 875 F.2d 810, 811 (10th Cir. 1989))).

More specifically, Plaintiffs here operated "business organization[s] that could or did shift as a unit from one [car-service] to another," suggesting Defendants did not exercise significant control. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Neither Plaintiffs' franchise agreements nor TLC regulations barred Plaintiffs from either providing rides arranged through dispatch bases other than the Franchisor Defendant with whom they had affiliated, or from driving for other, competing black-car companies.[23] The agreements likewise did not prohibit Plaintiffs from driving clients of their own (provided that payment by any CTG client was processed through the CTG system), or from picking up street hails (though doing so was forbidden by TLC rules).

To be clear, pursuant to the economic reality test, "it is not what [Plaintiffs] *could* have done that counts, but as a matter of economic reality what they

---

[23] The Secretary of Labor incorrectly describes this practice as barred by TLC regulations. As Plaintiffs admit in a post-argument letter brief, TLC regulations permit black-car drivers to provide rides for other black-car companies provided certain disclosures are made to the customer. *See* 35 R.C.N.Y. § 59A-11(e); Ltr. from Appellants to Court (Feb. 12, 2016); *cf.* N.Y.C. Taxi & Limousine Comm'n, Notice of Public Hr'g and Opportunity to Comment on Proposed Rules, Amendment of For Hire Dispatch Rules, TLC-71, at unnumbered 3 (Sept. 12, 2014), http://rules.cityofnewyork.us/sites/default/files/proposed_rules_pdf/fhv_dispatch_rules_final_9_12_14.pdf (noting the practice of dispatch bases to "dispatch[] vehicles affiliated with other bases . . . without the knowledge or consent of the vehicles' affiliated bases," giving rise to issues "not addressed in the TLC's rules").

24

actually *do* that is dispositive." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987). It is undisputed, however, that Plaintiffs here actually *did* provide rides to non-CTG clients in at least three different ways.[24]

First, many Plaintiffs provided rides by driving for competing black-car companies. Tax returns demonstrate that Plaintiffs derived substantial revenue from this practice. Ranjit Bhullar, for instance, earned $395,081.90 driving for "Exec. Charge" between 2006 and 2008, and Malook Singh earned $206,568.71 driving for "Elite" between 2006 and 2009. Indeed, some 71% of deposed Plaintiffs earned at least some income by driving for non-CTG black-car companies.

Second, it is undisputed that some Plaintiffs regularly drove personal clients. Anjum Ali, for example, had a repeat, non-CTG customer who first hailed him in 2010 and later arranged for pick-up in various places in New York

---

[24] It is certainly not unheard of for an individual to maintain two jobs at the same time, and to be an "employee" in each capacity. Plaintiffs, however, unlike traditional employees, were free — without compromising their franchises or facing adverse consequences — to divide their time as they saw fit between CTG, its competitors, and personal clients. *See Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408 (7th Cir. 2007) (describing an independent contractor as an individual who "appears, does a discrete job, and leaves again"). Mazhar Saleem, for example, drove for five black-car companies in addition to CTG between 2009 and 2012, earning sums that ranged between $539.10 at the low end to $11,052.00.

City by calling Ali at his home number.[25]  Jose Solorzano, for his part, also had

one personal client for eight to ten years,[26] and Avneet Koura was contacted

directly "[o]nce or twice a week" by repeat personal clients between 2006 and

2008.  J.A. 404–05.  Plaintiffs made investments to build these relationships, too.

Some created business cards describing their services, while others placed

advertisements.[27]

Third, for the sake of completeness, many Plaintiffs also picked up

passengers via street hail, despite TLC's (apparently under-enforced) prohibition

of this practice.  *See* 35 R.C.N.Y. § 55-19.  In fact, one driver admitted doing so

while "logged in" to the CTG app and waiting in the dispatch queue.  As with

individual, non-CTG clients, street hail passengers paid in cash or via

independent merchant accounts, rather than through the CTG voucher system.

---

[25] Ali did not turn over any of that money to CTG for processing, nor was he required to do so, since the customer was not a CTG client.

[26] Despite CTG rules to the contrary, Solorzano billed this repeat CTG customer using his personal credit card merchant processing account, rather than the CTG voucher system.

[27] Though "customer rapport" is arguably not "an initiative characteristic," *Mr. W Fireworks*, 814 F.2d at 1053 (quoting *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1314 (5th Cir. 1976)), these long-term relationships, at a minimum, demonstrate drivers' independence, their exercise of initiative, and Defendants' relative lack of "control" — all indicia of independent contractor status, *Superior Care*, 840 F.2d at 1058.

Moreover, these alternate means of generating revenue aside, Plaintiffs also wielded considerable independence and discretion when working under CTG's umbrella. To offer rides to CTG clients, Plaintiffs could join a physical queue outside of a high volume client business, offer assistance to disabled customers seeking prearranged rides pursuant to CTG's contract with the MTA, or book into CTG's dispatch system. Further, some Plaintiffs who owned franchises chose not to drive at all and, instead of letting their franchises lie dormant, permitted other individuals to drive for them.[28] *See Silk*, 331 U.S. at 718 (observing that truck-drivers' practice of "hir[ing] their own helpers" supported finding of independent contractor status).

Accordingly, far from a circumstance, like that in *Superior Care*, where the individuals seeking "employee" classification "depended entirely on [the putative employer's] referrals to find job assignments," 840 F.2d at 1060, Plaintiffs here possessed considerable independence in maximizing their income through a variety of means. By toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from CTG's clients, drivers' "profits increased" through "'the[ir] 'initiative,

[28] Anwar Bhatti testified that Rajeev Kumar paid him $75 per week to drive for Bhatti's franchise. Jamshed Choudhry similarly rented the use of his franchise to third parties on two occasions for $75 per week and $130 per week, respectively.

judgment[,] or foresight'" — all attributes of the "typical independent contractor." *Keller*, 781 F.3d at 809 (quoting *Rutherford*, 331 U.S. at 730). Whatever "control" CTG exerted over negotiated fares and its rolls of institutional clients, Plaintiffs retained "viable economic status that [could] be [and was] traded to other [car companies]." *Usery*, 527 F.2d at 1312. Thus, as a matter of economic reality, Plaintiffs' affiliation with Defendants was but one means by which they generated income from their driving businesses.

## C. Investment and Return

Regardless whether they actually purchased a franchise, the record also shows that Plaintiffs invested heavily in their driving businesses — another indication that they were "in business for themselves." *Superior Care*, 840 F.2d at 1059. In the economic reality test, "large capital expenditures" — as opposed to "negligible items, or labor itself" — are highly relevant to determining whether an individual is an employee or an independent contractor. *Dole*, 875 F.2d at 810; *see also id.* at 810–11 (deeming "annual investment of $400 in tools or equipment" to be "negligible"); *cf. Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension*, 85 F.3d 1374, 1378 (8th Cir. 1996) (affirming finding of independent contractor status under common law agency test in part because "[t]he owner-

operators were responsible for . . . purchasing and maintaining the leased equipment, [and] paying operating expenses such as fuel and repairs"). In assessing such expenditures, we ask whether the alleged employee made financial commitments in an attempt to generate a "return on . . . investment."[29] *Dole*, 875 F.2d at 811; *see, e.g., Silk*, 331 U.S. at 716 (affirming truck-drivers' independent contractor status when they, *inter alia*, "own[ed] their trucks"). Here, Plaintiffs indisputably did.

In disclosures to the New York State Attorney General, each Franchisor Defendant presented an "estimated initial investment" to be expected in acquiring a franchise. *See, e.g.,* J.A. 1817–20. One Franchisor Defendant estimated expenses for an individual purchasing a franchise as totaling between $68,838 and $89,038.[30] J.A. 1817–20. Such sums constitute a substantial financial

---

[29] While "investment in the business" is, itself, indicative of independent contractor status, *Dole*, 875 F.2d at 810, it also gives rise to other economic realities relevant to the FLSA "employee" inquiry. "The capital investment factor is," for example, "interrelated to the profit and loss consideration." *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987). Economic investment, by definition, creates the opportunity for loss, but investors take such a risk with an eye to profit. In addition, a personal stake can create incentives for the exercise of "independent initiative," *see Superior Care*, 840 F.2d at 1058–59, so as to recover one's investment.

[30] The NYC 2-Way franchise disclosure statement, by way of example, lists the following expenses:

outlay on Plaintiffs' part, even beyond the purchase or rental of the franchise itself, and in essential facets of Plaintiffs' business operations: vehicle acquisition,[31] fuel, repair, and maintenance, license, registration, and insurance fees, and tolls, parking, and tickets. CTG did not provide reimbursements for

- Initial franchise fee: $40,000*
- Vehicle: $15,000–$33,000
- Smart phone: $350–$500
- Installation fee (for dispatch system app): $500*
- Security deposit (returned at end of franchise agreement): $5,000*
- Administrative fee: $1,000*
- Training fee: $250*
- TLC vehicle license fee: $550
- New York vehicle registration inspection fee and tax stamp: $473–$523
- Liability insurance: $5,500–$7,500 per year
- Magnetic window signs: $150
- Gasoline: $65 per tank

J.A. 1817–20. Asterisks denote payments made to NYC 2-Way, with all other payments notably going to third parties. In addition, drivers paid weekly fees of $56 or $80, depending on whether they were a "sole proprietor" and operating on a single shift or, instead, they "operated [a] double-shift[]." J.A. 1341.

To be sure, not all Plaintiffs spent this projected amount; some may have opted for franchise arrangements which entailed a smaller upfront payment with greater recurring fees. Plaintiffs who rented franchises avoided paying this upfront fee altogether, although the record shows that they made other, significant investments in, *inter alia*, their vehicles, license and registration, fuel, maintenance, and repairs.

[31] Some drivers purchased their vehicles, while others rented.

these expenses,[32] never mind for discretionary investment in business cards, advertising, or other ventures designed to attract customers.

Because Plaintiffs were free under their franchise agreements to branch out on their own, or to drive for other, competing black-car companies, the degree to which these expenditures yielded returns was a function not only of CTG's network, but also of the business acumen of each Plaintiff, who thus had significant control over "essential determinants of profits in [the] business."[33]

---

[32] All franchise agreements contained the following language: "Franchisee shall be solely responsible for all fees, taxes, charges, fines, inspections, repairs, summonses, and all other aspects involving Franchisee and Franchisee's vehicle." J.A. 3408–09.

[33] Indeed, seven black-car franchisees filed an amicus brief emphasizing their "freedom" as "entrepreneurs," and arguing that finding they were employees would jeopardize "the future viability of their investment in black car franchises." Br. for *Amici Curiae* Mark Malchikov et al. in Support of Appellees and in Favor of Affirmance 2, 9.

To be sure, compensation on a piecework basis has sometimes been likened to "wages," rather than a return on investment. *Mr. W Fireworks*, 814 F.2d at 1050–51. *But see Freund*, 185 F. App'x at 783 (per curiam) (plaintiff, deemed an independent contractor by the lower court, "was almost entirely compensated by the job and not the hour; therefore, by accepting more jobs, performing his work more efficiently and hiring employees, he could earn greater sums of money"). Because we evaluate the "totality of the circumstances," however, the form of payment does not dictate a finding of employee status. In *Herman*, for instance, the Fifth Circuit determined that the district court did not err in finding courier delivery drivers, "compensated on a commission basis," and for whom "customer volume and the amount charged to customers" were "control[led]" by the entity, to be independent contractors. 161 F.3d at 304–05. The *Herman* panel concluded that, despite these facts, other factors supported the district court's conclusion that the couriers were independent contractors. The couriers, *inter alia*, "set their own hours and days of work and [could]

*Dole*, 875 F.2d at 810.  Further, while Plaintiffs ultimately all chose to affiliate with the Franchisor Defendants, their investments were valuable — and likely necessary — even had they chosen to affiliate with a different black-car dispatch base.  Thus, Plaintiffs' expenditures created the platform for a black-car business that could be operated throughout the tri-state area, whether for Defendants or otherwise, again suggesting Plaintiffs were independent contractors, and not employees.

### D. Schedule Flexibility

The ability to choose how much to work also weighs in favor of independent contractor status.  *See Herman*, 161 F.3d at 304; *Arena v. Plandome Taxi, Inc.*, No. 12 CV 1078(DRH)(WDW), 2014 WL 1427907, at *5 (S.D.N.Y. Apr.

---

reject deliveries without retaliation[, and] . . . work for other courier delivery systems," since their franchise agreement did not contain a non-compete clause.  *Id*. at 303.

When employees are compensated "on a piecework basis," *Dole*, 875 F.2d at 809, moreover, the FLSA economic reality inquiry asks how much revenue flows to the worker.  *Compare, e.g.*, *Delux Transp. Servs., Inc.*, 3 F. Supp. 3d at 11 ("There is also no dispute that [the driver, deemed an independent contractor,] received all revenues generated by the fares [the driver] picked up."), *with Dole*, 875 F.2d at 809 (cake decorators, classified as employees, were paid only 20% of the price of each cake) *and Mr. W Fireworks*, 814 F.2d at 1046 (operators of firework stands, also classified as employees, made only a "15% commission on fireworks sold").  And as Eduard Slinin, CTG's president, testified here, a "majority of the revenue [went] . . . to the driver" for CTG rides.  J.A. 616–17.  CTG generally applied a small, flat processing fee for each voucher, and also took a percentage fee on the entire voucher amount upon Defendant Franchisor's payment of vouchers to franchisees (in the range of 15–33% of the voucher amount).

14, 2014) (noting fact that transportation company "dictated the hours the drivers worked" supported employee status); *Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 10 (E.D.N.Y. 2014) (noting fact "that Defendants had little control over when Plaintiff drove, how much he dr[o]ve, or how frequently" "very persuasive[ly]" supported independent contractor status.); *cf. Berger Transfer & Storage*, 85 F.3d at 1378 (affirming finding of independent contractor status based in part on "considerable autonomy regarding when and how long they would work" under common law agency test). Here, Plaintiffs' schedules were not merely "*relatively* flexible," *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984) (emphasis added), but rather were entirely of their making.

After purchasing or leasing a franchise and securing a suitable vehicle, Plaintiffs set their own schedules, selecting when, where, and how often to work (if at all). Defendants provided no incentive structure for Plaintiffs to drive at certain times, on particular days, or in specific locations, leaving the decision to work "to the whims [and] choices" of its drivers. *Dole*, 875 F.2d at 806. Likewise, Defendants required no notice on the part of drivers as to when they intended to work, nor did they make any effort to coordinate drivers' schedules.

Here, as always with the "economic reality" inquiry, it is not merely that Plaintiffs nominally could set their own schedules, but also that they actually did so. *Id*. at 808. Some Plaintiffs took vacations for weeks at a time without ever notifying Defendants. Anjum Ali, for example, took five weeks off to travel abroad, and regularly took off long weekends. Mazhar Saleem took a three-to-four month vacation in 2010 and vacationed for over two months in 2011. Jose Cabrera "t[ook] the entire year of 2011 off" from driving for Defendants, and resumed doing so in 2012. J.A. 3393 ¶ 148.

On the days when Plaintiffs did work, their hours varied — again, based on their own preferences, and without Defendants making any attempt to coordinate schedules or set lower or upper limits on working hours. *Cf. Dole*, 875 F.2d at 806 (holding that workers were employees because they did not "act[] autonomously, or with any degree of independence which would set them apart from what one would consider normal employee status"). Jagjit Singh sometimes worked as many as fifteen to sixteen hours a day, while Anjum Ali would typically log in from 4:00 p.m. until approximately midnight. Others drove on a far more sporadic basis.

Plaintiffs also exercised considerable discretion in choosing when and where to drive. *Superior Care*, 840 F.2d at 1059. Marlene Pinedo, for instance, explained that she drove "[f]rom Sunday to Friday . . . [b]ecause those are the days when there is the most work." J.A. 416. Pinedo made a similar calculation when determining the times of day during which she would drive, performing two separate shifts, 4:00 a.m. to 10:00 a.m. and 4:00 p.m. to 10:00 p.m., because "they used to give good jobs at those times." J.A. 417. Anjum Ali, on the other hand, preferred to drive in the evenings in part because, with friends driving at the same time, he could count on them if he needed help. Similarly — and predictably — drivers often selected a geographic zone based on the available jobs there, and record testimony indicates that certain zones in Manhattan were more active than others.[34]

Additionally, the record demonstrates that, as a matter of economic reality, Plaintiffs accepted and rejected (despite the penalty of being placed at the end of the queue) varying numbers of job offers, a fact indicative of the discretion and independence associated with independent contractor status. *Cf. Berger Transfer & Storage*, 85 F.3d at 1378 (affirming district court finding that it was indicative of

---

[34] For example, Zone 4, in midtown Manhattan, appears to have been particularly popular due to the volume of business there.

independent contractor status that long-distance truckers could and did refuse assignments without penalty); *Herman*, 161 F.3d at 303 (noting that couriers could reject job offers "without retaliation" in making the same determination). For example, in March 2011, Bhavesh Shah accepted 83 jobs, Jamshed Choudhry accepted 148, and Jose Solorzano accepted fifteen. Likewise, from May 2010 to May 2013, Ranjit Bhullar rejected 949 job offers, while Wilman Martinez rejected none.[35]

Plaintiffs' flexible work schedules and considerable control over when, where, and in what circumstances to accept a CTG fare not surprisingly resulted in wide disparities in gross earnings for rides provided through Defendants.[36] For example, while Jagjit Singh grossed more than $170,000 in 2009 and 2011, J.A. 3433, Anjum Ali earned between $38,928 and $42,445 a year from 2010 through 2012, J.A. 3431. These differences only underscore the economic reality, namely that the "work force [was] composed of individuals who came and went as they

---

[35] Likewise, after accepting and receiving information concerning a job, some Plaintiffs "frequently bail[ed] out" of jobs despite the three hour lockout penalty, while others "rarely" did so. J.A. 3395 ¶¶ 153–54.

[36] The franchise agreements made no guarantees about how much work Plaintiffs could expect.

alone pleased," *Dole*, 875 F.2d at 807, an undisputed fact that is all the more remarkable given the volume-driven nature of the business.

In the language of the *Silk* factors, these undisputed facts demonstrate that Defendants did not "exercise control," and that Plaintiffs demonstrated "initiative." *Superior Care*, 840 F.2d at 1060. They also show that, whatever "the permanence or duration" of Plaintiffs' affiliation with Defendants, *id.* at 1059, both its length and the "regularity" of work was entirely of Plaintiffs' choosing, *cf. Keller*, 781 F.3d at 807 ("We may look at the length and regularity of the working relationship between the parties [in assessing the nature of their relationship].").

These circumstances are readily distinguishable from those in which courts have identified an employer-employee relation. In *Superior Care*, for instance, the employer "limited working hours to 40 per week where nurses claimed they were owed overtime," 840 F.2d at 1060, and in *Reich v. Circle C. Investments, Inc.*, the employer "exercise[d] a great deal of control over the [plaintiffs]," who were "required to comply with weekly work schedules," 998 F.2d 324, 327 (5th Cir. 1993). In *Dole v. Snell*, the plaintiff cake-decorators' schedules were "totally controlled" by their employer: they were expected to arrive at the premises at a

particular hour, prevented from leaving until they had decorated all the cakes to their bosses' satisfaction, and required to seek their employer's approval for vacation. 875 F.2d at 806. In short, "[t]he demands of the business controlled the [workers' schedule]," *id.*, which was indisputably *not* the case for Plaintiffs here.

Instead, this case resembles those in which we and other Circuits have recognized independent contractor status. In *Kirsch v. Fleet Street*, for example, we upheld a jury finding that the plaintiff was an independent contractor when, *inter alia*, he "was not required to spend time in the company's offices [and] was free to set his own schedule and take vacations when he wished." 148 F.3d at 171. Likewise, in *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, the Fifth Circuit concluded that a courier service "had minimal control over its drivers" such that they were independent contractors because, *inter alia*, "[t]he drivers set their own hours and days of work." 161 F.3d at 303. Similarly here, Plaintiffs' freedom in choosing when, where, and with what regularity to drive CTG clients shows the extent of their economic independence — that they operated their "business organization[s]" on their own terms, and as they saw fit. *Rutherford*, 331 U.S. at 730.

* * *

38

In sum, Plaintiff black-car drivers exercised their business acumen in choosing the manner and extent of their affiliation with CTG; were able to work for rival black-car services, cultivate their own clients, and pick up street hails; made substantial investments in their businesses; and determined when, where, and how regularly to work. They owned or operated enterprises which were flexible and adaptable to market conditions. In short, based on the record here, "[t]hese driver-owners [were] small businessmen." *Silk*, 331 U.S. at 719.

**III.**

Plaintiffs, for their part, rely on record evidence that they contend shows that Defendants exercised control over black-car drivers, so as to make them economically dependent on CTG. Such evidence, Plaintiffs contend, creates a genuine issue as to whether Defendants exercised control over drivers such that they constituted "employees" pursuant to the FLSA. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We disagree. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. Here, the evidence on which Plaintiffs rely does not change the "economic reality" of their business relationship with Defendants. *Superior Care*, 840 F.2d at 1059.

39

Plaintiffs marshal evidence principally in support of two propositions. First, they argue that the record shows that Defendants exercised control over "all significant aspects of its black car business."[37]  Appellant's Br. 11.  Plaintiffs point, *inter alia*, to CTG's roll of organizational clients, its development and operation of the dispatch system, and the fact that CTG negotiated rates with clients and charged a per-ride fee to drivers.  Second, in Plaintiffs' telling, Defendants exerted influence over drivers by enforcing the Rulebooks indirectly through the Security Committees and, at times, directly through Eduard Slinin, CTG's president.

Neither proposition, even viewing the evidence in the light most favorable to Plaintiffs, changes the analysis.  While Defendants did exercise direct control over certain aspects of the CTG enterprise, they wielded virtually no influence over other essential components of the business, including when, where, in what

---

[37] Plaintiffs fault the district court for pointing out that the first *Superior Care* factor "concerns 'degree of control *exercised* by the [Defendants].'"  *Saleem*, 52 F. Supp. 3d at 538 (alteration in original) (quoting *Brock*, 840 F.2d at 1058).  Plaintiffs contend this is the incorrect test: "It is well established that the 'power to control' is . . . the 'overarching concern' of the control factor."  Appellant's Br. 32 (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 105, 114 (2d Cir. 2013)).  But it is Plaintiffs who mistake the "joint employer" test, which does have such a formulation, for the "independent contractor" test, which turns on — consistent with our focus on "the economic reality" — the actual exercise of control.  *Compare, e.g.*, *Barfield*, 537 F.3d 149; *Zheng*, 355 F.3d at 68, *with Superior Care*, 840 F.2d at 1058.

capacity, and with what frequency Plaintiffs would drive. "[A]ccepting that Defendants engaged in some monitoring and discipline" with respect to Rulebook standards does not alter this picture. *Saleem*, 52 F. Supp. 3d at 539. While it may reflect a degree of control over Plaintiffs' conduct, here, as in *Herman*, the "opportunity for profit and loss was determined by the drivers to a greater degree than [it was by Defendants]." 161 F.3d at 304. Drivers decided with which dispatch base to affiliate (even among those integrated with CTG), whether to purchase or rent franchises, and, once affiliated, how to go about their work. They could and did provide rides in three separate ways for CTG, for multiple car services concurrently, for independent, personal clients, and through street hails (albeit in contravention of TLC rules). In short, the *economic* reality was that Plaintiffs, with the assistance of CTG and as a "subscriber to [its] services," J.A. 732, operated like small businesses; they decided to affiliate with Defendants based on *their* perceived economic interests, and not those of CTG.

To be clear, we note in conclusion the narrow compass of our decision. Specifically, we do not here determine that it is irrelevant to the FLSA inquiry that the Defendants provided Plaintiffs with a client base, that Defendants charged fees when Plaintiffs utilized Defendants' referral system, or that

41

Defendants had some involvement, if limited, in rule enforcement among franchisees. We conclude only that assessing the totality of the circumstances here in light of each *Silk* factor, undisputed evidence makes clear as a matter of law that *these* Plaintiffs were not employees of *these* Defendants. In a different case, and with a different record, an entity that exercised similar control over clients, fees, and rules enforcement in ways analogous to the Defendants here might well constitute an employer within the meaning of the FLSA. Plaintiffs here, however, have raised no material issue to this effect. The district court therefore properly found them to be independent contractors as a matter of law.

## CONCLUSION

We have considered Plaintiffs' remaining contentions and find them to be without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.